# IN THE UNTED STATES DISTRICT COURT
# MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| PLAINTIFF, | * | CV-05-1086-WKW-DRB |
| VS. | * | |
| | * | |
| EIGHTY THOUSAND SIX HUNDRED THIRTY-THRREE DOLLARS | * | |
| ($80,633.00) IN UNITED STATES CURRENCY; FOUR THOUSAND EIGHT HUNDRED SEVENTY-EIGHT DOLLARS ($4,878.00) IN UNITED STATES CURRENCY; AND | * | |
| THIRTY-SIX THOUSAND FIVE HUNDRED DOLLARS ($36,500.00) IN UNITED STATES CURRENCY | * | |
| | * | |
| DEFENDANTS. | | |
| | * | |

## BRIEF IN SUPPORT OF MOTION TO SUPPRESS

## FACTS AND PROCEDURAL HISTORY

The facts below are not in dispute.

On or about July 5, 2005 at an unknown time in the mid-morning, Michael Coleman and Jacquard Merritt arrived at the Montgomery Regional Airport to take a trip to San Antonio, Texas. Coleman and Merritt used cash to purchase round trip tickets in their true names for a flight leaving roughly at 11:30 a.m. and returning the morning of the next day. Coleman and Merritt did not check any luggage and carried two duffel bags.[1] After receiving their boarding passes, Coleman and Merritt presented themselves at the initial security checkpoint where TSA agents compared the names on the boarding

---

[1] The Government does not contend that Coleman and Merritt were surveilled due to a drug courier profile or that their detentions were predicated on the drug courier profile.

passes with the names on their identifications. Seeing no discrepancies, both individuals were handed back their boarding passes and allowed to proceed to the screening area. There, Coleman and Merritt placed their carryon luggage on the x-ray machine conveyor belt where it passed through without issue. Both Coleman and Merritt walked through the metal detector without setting off the alarm. For an unknown reason, both Coleman and Merritt were selected to be "secondarily screened". Coleman went first where he handed over his boarding pass to a TSA agent and was scanned with a hand held metal detector and subsequently patted down. Finding no weapons, contraband or device which could bring a plane down, Coleman was handed back his boarding pass and permitted to retrieve his blue carry-on. Coleman then proceeded to the gate area without further issue.

Merritt followed Coleman and upon Merritt's screening he also handed his boarding pass over to the TSA agent where he was scanned with a handheld metal detector and patted down as well. The search of Merritt did not reveal any contraband, weapon or any device that could bring a plane down. As Merritt's carry-on bag passed through the x-ray machine, it was retrieved by TSA agent Aplin. Aplin physically searched Merritt's carry-on and the shaving kit inside. The physical inspection of the shaving kit did not reveal any contraband, weapon, or incendiary device that could bring a plane down, however, it did reveal an unknown amount of cash.

After spotting the cash, TSA agent Aplin summoned his supervisor, TSA agent. Jackson and Airport Police Officer Green, and turned the shaving kit containing the cash as well as Merritt's boarding pass over to them. Jackson and Green thumbed through the money and presumed that it may be around $10,000.00.[2] Jackson and Green maintained control over Merritt's shaving kit and boarding pass and instructed him to go into a

---

[2] The actual amount of money was $4,878.00.

2

secured office within the airport. Merritt took hold of his carry-on and did as Green and Jackson instructed and proceeded into a secure room adjacent to the concourse.[3] There, Green and Jackson questioned Merritt regarding the source and the purpose of the money. Green told Merritt if he could prove that the money came from a legitimate source, he could go on about his business. A short time later, Green received a phone call and a fax explaining the source of the money as well as its legitimacy, however according to Green, the documentation did not satisfy him. Green continued to question Merritt regarding the source and intended use of the money. Merritt gave multiple explanations as to why he was carrying the sum of cash and its intended use, none of which satisfied Officer Green. Green then searched Merritt's carry-on (which originally contained the shaving kit) without his consent and without a warrant, where an additional larger sum of cash was revealed. Officer Green then contacted the Drug Enforcement Agency for assistance.

During Merritt's detention, TSA agent Aplin discovered that Merritt was traveling with a companion, Michael Coleman. Aplin and an unidentified Airport police officer located Coleman in the upstairs portion of the gate area. Coleman was "asleep" was accosted by Aplin and the unknown Airport Police Officer and told that he needed to be re-screened and was instructed to accompany agent Aplin and the officer downstairs for that purpose. Aplin took hold of Coleman's blue carry-on and boarding pass and marched Coleman downstairs, as he (Aplin) followed behind. Coleman was not led back to the x-ray machine, but instead was led to the secure room adjacent to the concourse.

---

[3] Agent Aplin and Officer Green claimed that their detention of the cash was to ensure that Merritt declared it to satisfy U.S. Customs regulations by declaring currency in excess of $10,000.00 when traveling out of the country. However, both Aplin and Green knew Merritt was not traveling out of the country but to San Antonio, Texas, (because it was on his boarding pass) wherein there is no need to declare funds for customs purposes. Moreover, Green admitted the airport does not have a customs office or customs forms used to declare such items.

3

As Coleman was instructed to enter the secure room, he turned toward the ground transportation exit and attempted to leave, but was ordered by another TSA agent to go inside the secure room. Coleman returned towards the secure room and began walking toward the door when he suddenly turned around and attempted to leave for the second time. A TSA agent attempted to cut off Coleman's route of egress, however Coleman's quick feet enabled him to get past the agent.

Coleman was pursued by airport police a short distance inside the terminal where he stopped and turned around either as a response to their command or on his on volition. Airport police seized Coleman by the arm and marched him into the secure room.

Once inside the secured room, Coleman was frisked, handcuffed, and sat in a chair. Without Coleman's consent or a warrant, Coleman's duffel bag was searched by Airport Police and TSA agents revealing a substantial amount of cash. Coleman was asked questions regarding the cash, however he refused to answer and asked for a lawyer.

Sometime within forty-five minutes to an hour of the seizure of Coleman, agents from the Drug Enforcement Agency arrived to question Coleman and Merritt. The contents of both Merritt's carry-on and Coleman's carry-on were displayed on a table and subjected to a dog sniff. The drug sniffing dog alerted to the cash of both Coleman and Merritt and on Merritt's carry-on. Agents found marijuana residue in Merritt's carry-on, but nothing in Coleman's carry-on.

The cash was counted by DEA agents and receipts issued to both Coleman and Merritt. Both individuals were later released that day. As of the filing of the forfeiture action, neither Coleman nor Merritt have been charged with a controlled substance violation in connection to the cash.

The DEA seized the currency for forfeiture purposes under 21 U.S.C. Section 881(a)(6), averring that the cash was derived from and/or intended to be used in a controlled substance crime.

**Contentions and Issues**

The claimants concede that airport screening searches are constitutional administrative searches, limited in scope and duration, subject to the Fourth Amendment. Claimant Merritt contends that the seizure of his shaving kit containing cash, and his subsequent detention, went beyond the limited scope of the airport screening process and was not supported by probable cause as required by law. And the further search of his luggage while in police custody was without a warrant, without his consent, and without probable cause coupled with exigent circumstances and per se unreasonable for Fourth Amendment purposes.

Claimant Coleman contends that his detention and the subsequent seizure of his cash was not justified under the airport screening search as well. Coleman argues that his seizure after successfully passing the airport screening process and being cleared to proceed to the gate, was unreasonable, not supported by probable cause, much less reasonable suspicion. And that his forced march to the Airport Police Office amounted to an arrest, not supported by probable cause, and that his departure from the office was well within his rights under the law to resist an unlawful arrest, and the warrantless seizure and search of his carry-on was without a warrant, without consent, and without probable cause coupled with exigent circumstances, in violation of his rights under the Fourth Amendment.

In its response to the court's order to show cause as to why the claimant's motion to suppress should not be granted, the government contends that there are three exceptions to the warrant requirement that would allow government agents to seize the cash as well as the claimants. First, the government proffers the plain view doctrine. Second, probable cause coupled with exigent circumstances. Finally, reasonable suspicion of criminal activity. [See Response to Show Cause Doc.# 28 p. 5.] The claimants contend that the exceptions to the warrant requirement on which the government is traveling can not get the government to its desired destination.

## ARGUMENT

**Airport Screening-Scope of Search**

Airport searches are administrative searches part of a general regulatory scheme in furtherance of an administrative purpose, rather than as part of a criminal investigation to secure evidence of a crime. Camara v. Municipal Court, 387 U.S. 523, 528-529 (1967); U.S. v. Moreno, 475 F.2d 44 (5th Cir. 1973); U.S. v. Skipwith, 482 F.2d 1272 (5th Cir. 1973). Such searches are subject to the Fourth Amendment and are limited in duration and scope to that effect which make them legal in the first place. U.S.v. Davis, 482 F.2d 893, 909 (9th Cir. 1973). An Airport screening search is reasonable if (1) it is no more extensive or intensive than necessary, in light of current technology, to detect weapons or explosives; (2) it is confined in good faith to that purpose; and (3) passengers may avoid the search by electing not to fly. U.S. v. Marquez, 410 F.3d 612, (9th Cir. 2005). The purpose of airport screenings is to prevent passengers from bringing explosives or weapons or other dangerous items which could bring a plane down and preventing them from attempting to do so. Marquez at 616. However, government officials may not use

6

an administrative search to investigate criminal activity. Michigan v. Clifford, 464 U.S. 287, 294-295 (1984). "Should that search be a general search for evidence of a crime, we would not hesitate to exclude the evidence so obtained." Davis at 909. If the purpose of the search is to uncover evidence of criminal activity, government officials must obtain a criminal warrant. Clifford at 294.

Merritt successfully passed through the metal detector, had his carry on x-rayed, and successfully passed the "secondary screening criteria". Once Merritt's shaving kit was opened and did not reveal contraband or anything that could bring a plane down, Merritt should have been allowed to proceed to the gate area. The revelation of cash is of no consequence as it relates to the purpose of the screening.[4] TSA agent Aplin's authority to search under the airport screening search ended when he did not discover either an incendiary device, weapon or contraband. [See U.S. v. $124,570.00 in U.S. Currency, 873 F.2d 1240, 1246 (9th Cir. 1989) "having found no weapons or explosives in Campbell's bag, agent Kangas's legitimate interest in Campbell's identity and destination were at an end; there was no safety related justification for detaining Campbell and prying into his affairs."] At this point, Merritt had reasonably shown that he nor his belongings were a threat to bring the plane down. And seizing the cash and turning it over to airport police was not going make that matter any clearer. [See U.S. v. Villarreal, 963 R.2d 770,775 (5th Cir. 1992) customs official's search of 55-gallon drum not justified as administrative search because no reason to believe drum contained "dangerous instrumentality".] In the history of aviation there has been no finding that possession of United States Currency aboard an aircraft was used as an instrument to

---

[4] TSA agent Aplin admitted that discovering cash was "no big deal" which begs the question of the motivation for seizing the cash.

bring down a plane. Aplin's seizure of Merritt's shaving kit was unreasonable for Fourth Amendment purposes and outside to authorized scope of the search.

**Plain View Doctrine/Probable Cause coupled with Exigent circumstances-Merritt's shaving kit and other carry-on**

The government justifies the seizure of Merritt's shaving kit and cash by TSA agents Aplin and Jackson and Officer Green under the plain view doctrine. [See Response to Show Cause Doc. 28 p. 5.] In <u>Minnesota v. Dickerson,</u> 508 U.S. 366 (1993) the Court reaffirmed <u>U.S. v. Place,</u> 462 U.S. 696, 701 (1983) and explained the plain view doctrine and articulated what kind of objects could be seized, under this exception to the warrant requirement. There the Court stated that

> If police are in a lawful position from which they view an object, if its incriminating character is *immediately* apparent, and if the officers have a lawful right of access to the object, they may seize the object, without a warrant. If however, the police do not have *probable cause* to believe that the item in plain view is *contraband*, without conducting some <u>further search </u>of the item, i.e. if its incriminating character is *not* immediately apparent, the plain view doctrine <u>cannot</u> justify its seizure. <u>Dickerson</u> at 375.

The law contains requirements which the government fails to meet in order secure the property under this exception. First, the claimants do not contend that the TSA agent Aplin was not in a lawful position to observe the cash. Quite the contrary, agent Aplin and other TSA agents lawfully viewed the contents of Merritt's shaving kit and carry-on as it passed through the x-ray machine. Agent Aplin was in a lawful position as he manually inspected the shaving kit when he saw the cash. However, cash standing alone is not incriminating by nature. Additionally, TSA agent Applin had no probable cause to believe the cash in view was, in fact, contraband because cash by its very nature is not contraband. Nor was there any evidence proffered to suggest the cash carried by Merritt was evidence of a crime. [See <u>U.S. v. 30,000 in United States Currency,</u> 30 Fed.Appx.

8

473, 484 (6th Cir. 2002) no basis for a warrantless seizure of currency because no probable cause existed that the currency was evidence of a crime] Put another way, Government officials may not seize property without a warrant unless there is *probable cause* to believe the item is contraband, or evidence of a crime.  Place at 701.   Moreover, exigent circumstances did not exist as the cash/shaving kit/carry-on had been x-rayed and revealed no incendiary devices, weapons or other risks to the general public, and had been reduced to law enforcement's exclusive possession.  Under U.S. v. Chadwick, 433 U.S. 1, 15 (1977), luggage reduced to the exclusive possession of law enforcement needs a warrant to be searched absent exigent circumstances, even if officers possess probable cause the item contains evidence of a crime.  [See also Royer at 497.]  Thus a warrant was needed to search Merritt's other carry-on, absent consent.

Given the foregoing, the plain view doctrine and probable cause-coupled with exigent circumstances, cannot render the seizure of Merritt's shaving kit and cash and other carry-on lawful under the Fourth Amendment.

**The seizure of Merritt's shaving kit was not supported by reasonable suspicion or probable cause.**

The Government's contention that the detention of Merritt's shaving kit, (by Aplin after it came through the x-ray machine and it's continued detention as it was transferred to Jackson and Green) the detention of Merritt himself, and ultimately his carry-on after passing through the airline screening process, was supported by reasonable suspicion of criminal activity is not supported by the facts or the law.

9

The government cites U.S. v. Place, where the Court did allow government agents to seize luggage on less than probable cause, i.e. reasonable suspicion of criminal activity. The Court stated that

> We conclude that when an officer's observations lead him reasonably to believe that a traveler is carrying luggage that contains narcotics, the principles of *Terry* and its progeny would permit the officer to detain the luggage briefly to investigate the circumstances that aroused his suspicion, provided that the investigative detention is properly limited in scope.

However, in carving out this limited exception, the court re-affirmed long standing general principle that property may not be seized without a warrant, unless there is probable cause to believe it is contraband or evidence of a crime. Place at 701.

The facts in Place do not support the government's position. In applying the law, it is clear that reasonable suspicion did not exist that Merritts' luggage contained contraband when Aplin seized it and handed it over to Jackson and Green. In Place, agents articulated reasonable suspicion that Place's luggage contained narcotics prior to stopping him and seizing his luggage. In the case at bar, agent Aplin did not contend that Merritt's luggage or Coleman's luggage for that matter, contained narcotics or any other contraband. Aplin had physically inspected Merritt's shaving kit and x-rayed his carry-on and conceded that no reasonable suspicion existed that Merritt's carry-on contained contraband or other evidence of a crime. Aplin contended that he was suspicious of Merritt because Merritt was acting "nervous" as he inspected the cash by pacing and talking on the phone. Such actions even with the presence of cash would not give rise to probable cause that a crime had been committed, much less reasonable suspicion of criminal activity. [See U.S. v. Beck, 140 F.3d 1129, 1139 (8th Cir. 1998) not unusual for motorist to exhibit signs of nervousness when confronted by law enforcement) quoting U.S. v. Wood, 106 F.3d 942, 947-948 (10th Cir. 1997) "it is certainly not uncommon for

10

most citizens –whether innocent or guilty to exhibit sighns of nervousness when confronted by a law enforcement officer."] Moreover, Aplin's contention is clearly refuted in the video clip evidence at 5:38 where Merritt is putting on a belt while talking, not pacing, and hardly seeming nervous.  That being the case, any continued involuntary detention of Merritt and Coleman, as well as their luggage for that matter, had to be supported by probable cause.

**The Seizure and Arrest of Jacquard Merritt**

After TSA agent Aplin illegally seized Merritt's shaving kit and cash, Officer Green and TSA supervisor Jackson took possession of Merritt's shaving kit, cash and boarding pass and instructed him to follow them and go into a secure room within the airport.  At that point Merritt was seized for Fourth Amendment purposes. U.S. v. Espinosa Guerra, 805 F.2d 1502, 1507 (11th Cir. 1986) Royer at 501; U.S. v. Mendenhall, 446 U.S. 544, 544(1980).  The government agents marched Merritt into the secure room with Merritt entering first as they brought up the rear.  [See video at mark 5:53.]  This forced march elevated the seizure into an arrest as promulgated in U.S. v. Berry, 670 F.2d 583, 602-603 (11th Cir. 1982).

In Berry the 11th Circuit sitting en banc issued an opinion written by the Honorable Frank M. Johnson, Jr. that a government agent asking a specific individual to follow him into their on site office for further investigation did not only amount to a seizure, but rose to the level of an arrest, and as such, required probable cause.  Berry at 602.   Officer Green conceded that Merritt was not free to leave until he explained the origin and purpose of his cash to his satisfaction.  After Merritt did such, Green dismissed Merritt's source as incredible.  Though termed a "detention" by government agents,

11

Merritt's "detention" was prolonged in an attempt to see what criminal activity, if any, could be discovered.[5] This type of "detention" was addressed in <u>Dunaway v. New York,</u> 442 U.S. 200, 207-209 (1979) and followed by <u>Royer</u> at 499 where the Court found that

> In the name of investigating a person who is no more than suspected of criminal activity, the police may not carry out a full search of the person, or of his automobile, or *other effects*. Nor may the police seek to verify their suspicions by means that approach the conditions of arrest.

There, Dunaway was taken from his home to the police station and without being formally arrested, interrogated for an hour. The resulting incriminating statements were held inadmissible. "Reasonable suspicion of crime is insufficient to justify custodial interrogation even though the interrogation is investigative." <u>Dunaway</u> at 211-212 <u>Brown v. Illinois,</u> 422 U.S. 590 (1975) and <u>Davis v. Mississippi,</u> 394 U.S. 721 (1969) are to the same effect. What happened to Dunaway is precisely what occurred to Merritt and Coleman. Both detentions lasted over an hour and were custodial in perception and truth. They were both indefinitely detained while government agents looked for some evidence of criminal activity so that they could seize their money. As the statements in <u>Dunaway</u> were suppressed as fruit of the poisonous tree, so should all evidence gathered as a result of the detention and arrests of Merritt and Coleman.

**<u>The Seizure and Arrest of Michael Coleman</u>**

As previously stated, neither Coleman nor Merritt were suspected of being involved in narcotics prior to the revelation of cash in Merritt's shaving kit. No government agent surveilled them for fitting some characteristics of a drug courier profile. Both Coleman and Merritt traveled under his own name, submitted himself to the

---

[5] See footnote 3.

airport screening process, and endured the secondary screening process which included a physical pat-down. Coleman was allowed to proceed to his gate-given the fact no contraband or incendiary device was found. There is no charge that Coleman exited the airport, or made contact with a third party who had not been cleared. The authority and scope of the administrative airport search had come to an end. [See frame 4:17 (Coleman is cleared and picks up his blue duffel bag)]. The only facts known to the government agents when they seized Coleman was that he was traveling with Merritt to the same city. Such facts, standing alone, do not give rise of probable cause to arrest, much less reasonable suspicion to stop and question. However, government agents, after discovering that Coleman was traveling with Merritt, went to find him and seize him.

    At mark 10:50 of the video evidence, Aplin is seen leaving the office going to retrieve Coleman. According to testimony, agent Aplin found Coleman "asleep" upstairs near the departure gate. Aplin testified that since Merritt was found with sizeable amount of cash, he wanted Coleman to see "what else may have been going on." Upon renewing contact with Coleman, Aplin told Coleman that he needed to screen him again. Aplin's proffer was a lie to subject Coleman to an additional search in hopes of discovering cash or some other criminal activity in his bag. Such search could not be justified as an extension of Aplin's original authority under the administrative airport search as the search was not done in good faith, nor was it confined to airport search's original purpose. [See U.S. V. Marquez, 410 F.3d 612, 616 (9th Cir. 2005), U.S. V. $124,570.00 in U.S. Currency, 873 F.2d 1240, 1246 (9th Cir. 2005).] Agent Aplin took hold of Coleman's carry-on and boarding pass completing the seizure. [See Espinosa-Guerra at 1507; Royer at 501.] At mark 11:35 of the video evidence, Aplin is seen with

13

Coleman's blue carry-on in his left hand and another airport police officer as he (Coleman) is marched into the security office. As the video indicates, Aplin never submitted the bag for inspection as he told Coleman. For reasons already stated regarding Merritt's seizure and forced march, Coleman is not merely seized, but is under arrest. Berry at 602.

Even if government agents possessed reasonable suspicion to stop and detain Merritt, or possessed probable cause to arrest Merritt, such reason, without more, could not be imputed to Coleman based upon Coleman's trip on the same flight or otherwise connection to Merritt.

In Ybarra v. Illinois, 444 U.S. 85 (1979) the Supreme Court ruled that a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person. Thus it stands to reason that suspicion of Merritt, however much or little, could not be transferred to Coleman. Coleman could not be stopped or seized without objective grounds for doing so. Thus Coleman's seizure and forced walk to the security station was both without reasonable suspicion and probable cause, rendering any evidence, discovered after the arrest, including the defendant cash, inadmissible in a court proceeding.

The Court inquired as to what bearing Coleman's flight would have on the matter. Coleman's departure is not the type of "flight" that would warrant a stop and investigatory detention based upon reasonable suspicion as held in Illinois v. Wardlow 528 U.S. 119 (2000). In Wardlow, the Court stated that an individual's headlong, unprovoked flight in a high-crime area at the sight of police in a pre-accusatory stage, could furnish reasonable suspicion to stop the individual. But the Court declined to adopt

a *per se* rule that flight from the sight of police, in all cases, warranted a stop. The Court cited various reasons people flee at the sight of police officers, as well as giving deference to the time and place of the flight. "It is a matter of common knowledge that men who are entirely innocent do sometimes fly from the scene of a crime for fear of being apprehended as the guilty party…" Wardlow at 680 quoting Alberty v. U.S.162 U.S. 499, 511 (1896).

Wardlow is distinguishable and non applicable for several reasons. First, airports are not deemed high-crime areas. Coleman's flight cannot be deemed as headlong and unprovoked at the sight of police because Coleman had already been seized prior to his attempted flight, and was in fact, as a matter of law, under arrest by TSA agents and Airport Police. Coleman's "flight" was not unprovoked. It was provoked because Coleman had been illegally seized and his departure from custody merely manifested his intent to disengage the encounter with government agents. And when the TSA agent blocked his egress, Coleman's custodial status was cemented. [See video clip at 11:37-11:43.] When being accosted by law enforcement, the Supreme Court has held that

> The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. He may not be detained, even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds. Florida v. Royer 460 U.S. 491, 498 (1983).

Coleman's conduct becomes relevant only if the court finds that Coleman's second encounter with Aplin was not a seizure quickly morphing into an arrest, but purely a consensual encounter.

Once Coleman stopped, Airport Police placed him in custody walked him to the secure room, patted him down, and handcuffed him to a chair. The patdown revealed an

15

unknown amount of currency. Coleman refused to talk with government agents and instead asked for a lawyer. Coleman was not charged with a crime, but was not released. He remained handcuffed to the chair well over an hour as his luggage was manually searched, and their contents exposed revealing some eighty thousand dollars in cash. No contraband was found in Coleman's bag, however, the cash was subjected to a dog sniff where a canine indicated to the odor of some controlled substance. DEA agents then took possession of the cash. Coleman was released some time later. The same law applies to the search of Coleman's carry-on as it relates to the search of Merritt's carry-on. The search incident to arrest doctrine does not justify the search in either case because no weapon was reasonably thought to be in Coleman's bag, and no exigency existed. [See Chadwick at 15-16.]

**The Exclusionary Rule**

The exclusionary rule is applicable in forfeiture cases as it relates to all evidence, including the seized currency, if discovered as a result of an illegal search. One 1958 Plymouth Sedan v. Pennsylvania, 380 U.S. 693, 698 (1965) (bars the government from relying on evidence derived from an illegal search "to sustain a forfeiture".) The claimants move to exclude all evidence, including statements, the defendant currency, and carry-on luggage as fruit of the poisonous tree.

## CONCLUSION

The purpose of an airport search is to discover anything that can bring down a plane. It is limited in its duration and intensity to achieve that end. If contraband is discovered during the search, it does not render the search illegal. However, the search may not be extended or enlarged to search for evidence of a criminal activity or to

16

discover items not contemplated by its restrictive purpose. Once individuals submit to a security search during the airport screening process and successfully pass, the authority of the search ends and they may not be searched again absent reasonable independent grounds for doing so.

Cash is not contraband. Citizens have the right to carry legal United States Currency within the United States in whatever denominations are available. They may come and go within the fifty states whenever they please, and owe no government agent an explanation for doing so. Where large amounts of money may be unusual or even risky for the carrier, it alone is not indicative of criminal activity. The stop of Merritt and Coleman after they passed the security check was without reasonable suspicion and their arrests were without probable cause. The seized cash, any and all statements and conduct discovered after the seizure of the shaving kit and arrests of Coleman and Merritt should be suppressed as fruit of the poisonous tree.

                                    Respectfully Submitted,

                                    __/s/ Joe M. Reed_____
                                    Joe M. Reed
                                    Attorney for Defendant

Address of Counsel:

Faulk & Reed, LLP
524 S. Union Street
Montgomery, AL  36104
334.834.2000
334.834.2088 fax

**Certificate of Service**

I hereby certify that the foregoing was served on the Honorable John T. Harmon, Assistant United States Attorney, P.O. Box 197, Montgomery, AL 36101 by electronic notification by the clerk of the court this 12th day of January, 2007.

   /s/ Joe M. Reed___
Joe M. Reed