IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
|    Plaintiff, | ) |
| | ) |
| v. | )   CASE NO. 2:05-CV-1086-WKW |
| | ) |
| EIGHTY THOUSAND SIX HUNDRED | ) |
| THIRTY-THREE DOLLARS ($80,633.00); | ) |
| FOUR THOUSAND EIGHT HUNDRED | ) |
| SEVENTY-EIGHT DOLLARS ($4,878.00); | ) |
| THIRTY-SIX THOUSAND FIVE | ) |
| HUNDRED DOLLARS ($36,500.00) | ) |
| | ) |
|    Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

This is a civil forfeiture *in rem* action seeking forfeiture of United States currency in the amounts of $80,633.00, $4,878.00 and $36,500.00, which were seized at the Montgomery Regional Airport pursuant to U.S.C. § 881(a)(6).[1] The government alleges that the defendant currency is subject to forfeiture because it constitutes "monies furnished, or intended to be furnished, in exchange for controlled substances, or represents proceeds of trafficking in controlled substances or was used or intended to be used to facilitate violations of" 21 U.S.C. § 801. (Compl. ¶ 7.) On January 11, 2006, claimants Michael Coleman ("Coleman") and Jacquard Merritt ("Merritt") filed claims of ownership to the defendant currency asserting that the currency was unlawfully seized by

---

[1] 21 U.S.C. § 881(a)(6) provides that:

The following shall be subject to forfeiture to the United States and no property right shall exist in them:
. . .
   (6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter.

the government. (Answer ¶ 5.)[2] The claimants assert that they were detained without reasonable suspicion of criminal activity, arrested without probable cause for committing a crime, and interrogated without the benefit of counsel. (*Id.* ¶¶ 2, 3.)

Because these seizures were alleged violations of their Fourth Amendment rights, the claimants moved to suppress the seized currency. (Doc. #29.) On January 5, 2007, a hearing was held on the Motion to Suppress. The government called several witnesses; the claimants called none. Upon consideration of the evidence, and for the reasons that follow, the Motion to Suppress is due to be DENIED.

## I. FACTUAL BACKGROUND[3]

Claimant Merritt purchased airline tickets for himself and Coleman for a flight from Montgomery to San Antonio on July 6, 2006. The tickets were purchased together on the day of the flight. Neither man checked bags; each had a carry-on bag in his possession. A TSA supervisor, Agent Aplin, observed Coleman and Merritt as they entered the airport security checkpoint together. Because of the flow of passengers through the line at the checkpoint, Coleman and Merritt became separated. Coleman moved through the checkpoint first with a carry-on bag, and he was selected for additional screening. After initial screening and additional screening, Coleman was allowed to proceed to the gate.

---

[2] Claimants submitted affidavits attesting to their ownership of the defendant currency. (Answer, Exs. A & B.) However, these affidavits state that Coleman owns the $80,633 and Merritt owns the $36,500. (*Id.*) No affidavit states a claim of ownership of the $4,878, which the complaint alleges was found in Merritt's front pants pocket.

[3] Unless otherwise noted, this recitation of facts represents the factual findings of the court, and quoted testimony is credited as fact.

2

Merritt subsequently proceeded through initial screening and was also selected for additional screening. A search of his carry-on bag revealed a large amount of currency in a shaving bag located in his carry-on bag. When the cash was found, Merritt made a call on his cell phone, became visibly nervous, and paced. Upon a cursory examination of the currency, Agent Aplin determined that it probably exceeded $10,000, the amount which would have to be declared for international travel. Agent Aplin checked Merritt's itinerary and determined that he was flying to San Antonio on an 11:35 a.m. flight, with the return flight to Montgomery around 6:15 the next morning. Agent Aplin overheard Merritt say into the phone, "They found it." This behavior of Merritt aroused the suspicion of Agent Aplin, who summoned his supervisor, Agent Jackson, and an airport police officer, Corporal Green. Corporal Green thumbed through the currency and found it was held together by bank bands, but with rubber bands underneath. Corporal Green observed that the denominations were twenties and fifties. Corporal Green testified that he asked Aplin, "Why is he telling you he's carrying this money? He told me that he wouldn't tell him why. So I said, well, I'll tell you what; let me take the money and I'll ask him about it in our office." (Tr. 65.) With that, Corporal Green took control of the bag and asked Merritt to follow him to the police office across the hall about eight feet away.

When Corporal Green asked Merritt why he was carrying a such large sum, Corporal Green noticed that Merritt was "kind of nervous, kind of stammering" and said words to the effect that "I'm going to do some business with it." (Tr. 66.) Upon further questioning, Merritt stated that he was going to buy some property and that he was involved with real estate. At some point in the exchange, Merritt gave Corporal Green the name and phone number of a person for whom he said he worked. Corporal Green reached that person on the phone, who corroborated Merritt's

employment and agreed to send a fax. However, when the fax arrived approximately twenty minutes later, it did not "explain the money" but only stated that Merritt worked for the company. Moreover, it did not appear to Corporal Green to be the stationary of a business, but rather a document hastily put together on a computer. During the exchange with Corporal Green, Merritt also stated that he was brought to the airport by his mother.

In the meantime, Agent Aplin remembered that Merritt was traveling with a companion, who turned out to be Coleman. Agent Aplin and another officer proceeded to Gate 4 to find Coleman, "because I wanted to bring him back downstairs to do an additional search based off of the suspicious behavior of Mr. Merritt, because I wanted to ensure that he was not a threat to aviation." (Tr. 18.) When Coleman was located at Gate 4, he appeared to be sleepy or dozing, though he had only left the security checkpoint three minutes earlier. Upon being requested to return to the security checkpoint, Coleman responded, "No problem" and returned to the security checkpoint. (Tr. 46.) A further search of Coleman's bag resulted in the discovery of large amounts of cash secreted in his clothes. Aplin then summoned another law enforcement officer who took control of Coleman's bag. Coleman was directed toward the police office, which was in the general area where Corporal Green was questioning Merritt. Approximately five minutes had elapsed from the time Merritt had been detained at the security checkpoint until Coleman was directed into the police office.

Officer Robby Fitts, with the Montgomery Regional Airport Police, was operating the monitor room at the time Coleman was directed to the police office. Cameras located at various locations in the airport, including the security checkpoint, were monitored from this room in the police area. While monitoring the security camera, Officer Fitts observed an individual on camera, whom he later determined to be Coleman, approach the door to the police office following behind

Agent Aplin. Coleman hesitated coming in the room and took several steps away from the door. A female officer at the security checkpoint stopped him and directed him back to the office door. Coleman came back to the door, hesitated again, and, according to Officer Fitts, "I just saw him . . . break off running" through the checkpoint and back to the unsecured area of the airport, away from the gates and into the lobby. (Tr. 109.) When Officer Fitts observed Coleman make physical contact with the female officer as he pushed past her at the security checkpoint, he left his post and pursued Coleman. Officer Fitts twice ordered Coleman to stop, and he caught him some thirty to forty feet outside the security checkpoint in the airport lobby. Officer Fitts held Coleman by the arm and returned him to the police office.

      Corporal Green, still in the process of questioning Merritt, was aware of Coleman's actions. Initially he directed Officer Fitts to question Coleman in another room. Officer Fitts decided to "pat down" Coleman for officer safety, but Coleman was fidgeting. "He would not be still. He kept asking questions." (Tr. 110.) For his own safety, Officer Fitts proceeded to handcuff Coleman behind his back. A further search of Coleman exposed money that he had tucked in his jeans and in the pockets of his jeans. Officer Fitts asked Coleman what he intended to do with all the money, and Coleman stated that he was going to buy shoes. Officer Fitts stacked the money on the table near the handcuffed Coleman. Coleman then began to tell Officer Fitts that Officer Fitts "needed to get some of this money" (Tr. 122) and, "don't let these white boys take all this money from you. Get some of this money. I know law enforcement don't pay you that much." (*Id*. 112.) As he was making these statements, Coleman reached the money behind his back and attempted to stuff it behind training materials on the bookshelf in the office. Coleman also informed Officer Fitts that

he and Merritt drove together to the airport, contradicting Merritt's statement that Merritt was brought to the airport by his mother.

After fifteen or twenty minutes, Corporal Green decided to call for officers of the Drug Enforcement Administration (DEA). Drug Task Force Officers Larry Hubbard and Steven Brock arrived upon the scene fifteen to twenty minutes after being called. After being briefed, Agent Hubbard first interviewed Merritt who informed the agent that the primary reason for the trip was to purchase some real estate, "rental property and what not." At this point, Merritt also added that he would maybe also purchase a vehicle in San Antonio. Merritt told Agent Hubbard that he knew where some property was in a lower income housing area that he could buy and flip for a profit. Merritt also stated that he sometimes did such transactions on the internet. When asked to identify a website or other details about this type of transaction, Merritt was unable to identify an internet site or give the name of a real estate agent or any other information concerning the real estate business or the purchase of real estate in San Antonio. Merritt told Agent Hubbard that he did not know where he would be staying, perhaps with a girlfriend or a female friend, or maybe with another male individual who did not even know he was coming. Agent Hubbard observed that not only did Merritt not have definite plans for accommodations in San Antonio, but that he also had no business-type attire with him. Merritt was dressed in shorts and a tee shirt. Merritt gave Agent Hubbard a Montgomery street address and name of a real estate business for which he supposedly worked.[4]

A drug detection dog, Pyro, was brought in after Agent Hubbard began his interrogation of Merritt. Pyro alerted on Merritt's bag and on the currency on the table. Francisco Aponte, the dog's

---

[4] Agent Hubbard later drove by the address that was given to find only a small residential house with no business sign. Upon checking with state authorities, Agent Hubbard determined that there was no business affiliated with the name that Merritt gave him.

6

handler, interpreted Pyro's actions as being a positive alert for narcotics and so informed Agents Hubbard and Brock. Aponte could not recall whether the marijuana residue was found in the bag before Pyro alerted, or if Pyro's alert resulted in a further search of Merritt's bag. However, Agent Brock testified that he searched Merritt's bag. He found additional money and 18 milligrams of marijuana.

Agent Hubbard then proceeded to interview Coleman. Soon after he uncuffed Coleman and began the interrogation, Coleman said he wanted a lawyer, and the questioning ceased. Coleman left the airport after getting a receipt for the seized cash in excess of $80,000. He tore up his boarding pass as he left. It is not clear from the evidence when or how Merritt left the airport.

Neither Merritt nor Coleman has been charged with a crime in connection with this episode. Both were given receipts for the cash. Neither took their flight to San Antonio.

## II. DISCUSSION

On April 25, 2000, Congress passed the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA") codified in part at 18 U.S.C. §§ 981 and 983. CAFRA overhauled the procedures for civil judicial forfeiture proceedings. *See* 18 U.S.C. § 983. Significantly, the government now has the burden of proving by a preponderance of the evidence that the property is subject to forfeiture. *See* 18 U.S.C. § 983(c)(1); *see also United States v. One 1991 Chevrolet Corvette,* 390 F. Supp. 2d 1059, 1061 n.1 (S.D. Ala. 2005) (citing 18 U.S.C. § 983(c)(1)). Property subject to forfeiture includes all moneys given in exchange for illicit drugs, the proceeds of such an exchange, and all moneys used to facilitate a violation of the drug laws. *See* 21 U.S.C. § 881(a)(6); *United States v. $242,484.00,* 389 F.3d 1149, 1159-60 (11th Cir. 2004).

Motions to suppress evidence are appropriate in civil forfeiture cases because the seizure and subsequent civil forfeiture of the currency following a warrantless stop and search implicates the Fourth Amendment's probable cause requirement. *See One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693 (1965) (holding that the Fourth Amendment is applicable to forfeiture proceedings). The requirements of the Fourth Amendment are restated in CAFRA's statutory framework, which requires that seizures be made pursuant to a warrant or that seizures be based upon probable cause and pursuant to a lawful arrest or search. *See* 18 U.S.C. § 981(b)(2)(B). Thus, because the Fourth Amendment exclusionary rule applies in civil forfeiture proceedings, claimants may challenge the legality of the seizure of the defendant currency much like a defendant in a criminal case who brings a motion to suppress. *See, e.g., United States v. One Piece of Real Property Located at 5800 Sw. 7th Ave., Miami, Fla.*, 363 F.3d 1099 (11th Cir. 2004) (deciding motion to suppress filed by a claimant in civil forfeiture proceeding); *United States v. One 1993 Ford F150 Pickup*, 148 F. Supp. 2d 1258 (M.D. Ala. 2001) (Thompson, J.) (same).

The court must examine the evidence that led to the seizure of the currency to determine whether any intrusion upon claimants or their property was conducted without legal justification. In order to seize currency or arrest the claimants, law enforcement was required to have probable cause. "Probable cause in this context is a 'reasonable ground for belief of guilt, supported by less than prima facia proof but more than mere suspicion – the same standard used to determine the legality of arrests, searches, and seizures in criminal law.'" *$242,484.00*, 389 F.3d at 1160 (citations omitted). The probable cause standard is well established:

> Probable cause exists if the facts and circumstances within the arresting officer's knowledge and of which he had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has

>been or is being committed. The arresting officer need not have in hand sufficient evidence to convict, because when assessing probable cause we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. In other words, probable cause must not be judged with clinical detachment, but with a common sense view to the realities of normal life.

*United States v. Herzburn,* 723 F.2d 773, 775 (11th Cir.1984) (internal citations and quotation marks omitted).

In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court upheld the narrow authority of police officers who suspect criminal activity to make limited intrusions into an individual's personal security based on less than probable cause. A *Terry* stop falls between a full-blown seizure requiring probable cause and a consensual encounter not implicating the Fourth Amendment, and is justified on less than probable cause because it is substantially less intrusive than a traditional arrest.[5] The interests of crime prevention and detection and the protection of police officers support the intrusion, provided that police have a reasonable, articulable basis for suspecting that a person is committing or is about to commit a crime. *See Michigan v. Summers,* 452 U.S. 692 (1981). The stop must be limited to dispelling or verifying that particular suspicion. *Florida v. Royer*, 460 U.S. 491, 500 (1983). It must be temporally brief. *Id.* Ordinarily, law enforcement may not conduct a thorough search of persons or effects during a *Terry* stop. *Id.* (citing *United States v. Brignoni-Once*, 422 U.S. 873, 881-82 (1975)). "Nor may the police seek to verify their suspicions by means that approach the conditions of arrest." *Id.* at 499 (citing *Dunaway v. New York*, 442 U.S. 200 (1979)). Absent probable cause or

---

[5] The claimants argue that their seizure was a *de facto* arrest of both Merritt, when he was taken from the security checkpoint by Corporal Green, and Coleman, when he was asked to come back to the security checkpoint. Claimants' position on *de facto* arrest leaves virtually no space in the timeline for a *Terry* stop of either claimant. *See infra* note 17.

reasonable suspicion, law enforcement may not question or search an individual or his property without consent, and the burden of proof of consent rests with the Government. *Id*. at 497.

*Terry* stops may not be appropriate in all law enforcement investigative contexts. Detentions of this kind are justified in contexts where law enforcement interests are "sufficiently substantial" compared to the magnitude of the intrusion on Fourth Amendment rights. *United States v. Place*, 462 U.S. 696, 704-05 (1983). These law enforcement interests include "'preventing flight in the event that incriminating evidence is found,' 'minimizing the risk of harm' both to the officers and the occupants, and 'orderly completion of the search.'" *Id.* at 704 (quoting *Summers*, 452 U.S. at 702-03). In this context, law enforcement interests are compelling because of the "inherently transient nature of drug courier activity at airports." *Id.* Fourth Amendment considerations are comparatively limited "due in part to extensive antihijacking surveillance and equipment, reasonable privacy expectations are of significantly lesser magnitude." *Florida v. Rodriguez*, 469 U.S. 1, 6 (1984) (citation and internal quotation marks omitted).

In addressing the motion to suppress, "the court must first determine if and when the confrontation between [the claimants] and the various police officers turned from a consensual encounter, to which the [F]ourth [A]mendment does not apply, into a seizure . . . to which the [F]ourth [A]mendment does apply." *United States v. Williams*, 267 F. Supp. 2d 1130, 1133 (M.D. Ala. 2003). A consensual encounter becomes a seizure, either a detention or a *de facto* arrest, when the individual is no longer "free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). As Justice White aptly observed in *Royer*:

> We do not suggest that there is a litmus-paper test for distinguishing a consensual encounter from a seizure or for determining when a seizure exceeds the bounds of an investigative stop. Even in the discrete category of airport encounters, there will be

>endless variations in the facts and circumstances, so much variation that it is unlikely that the courts can reduce to a sentence or a paragraph a rule that will provide unarguable answers to the question whether there has been an unreasonable search or seizure in violation of the Fourth Amendment.

*Royer*, 460 U.S. at 507. Because it is bound to analyze this case on the totality of the circumstances, the court will address the circumstances of each claimant in turn.

*A.    Claimant Merritt*

Merritt was the second of the claimants to proceed through the security checkpoint, but the first to be detained. Merritt's initial contact with airport authorities was consensual. Merritt purchased a ticket and presented himself for security clearance at the security checkpoint, knowing the high probability of a search of his person and his carry-on bag. Air passengers are on notice they will be searched. "Air passengers choose to fly, and screening procedures of this kind have existed in every airport in the country since at least 1974. The events of September 11, 2001, have only increased their prominence in the country's consciousness." *United States v. Hartwell*, 436 F.3d 174, 181 (3d Cir. 2006).

Merritt's carry-on bag contained clothing and a shaving kit. Agent Aplin's search of the shaving kit at the security checkpoint revealed a substantial amount of cash in plain view. Upon discovery of the currency, Aplin noticed Merritt become nervous and start pacing. Merritt's behavior in the face of authoritative questioning would be sufficient to justify a TSA agent in briefly detaining him. "[I]f the initial stop was legal, the [officer] had the duty to investigate suspicious circumstances that then came to his attention." *United States v. Cruz*, 581 F.2d 535, 539 (5th Cir. 1978)[6] (en banc), *overruled on*

---

[6] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc) (adopting as binding precedent all of the decisions of the former Fifth Circuit haded down prior to the close of business on September 30, 1981).

*other grounds by United States v. Causey*, 834 F.2d 1179, 1184 (5th Cir. 1987). Moreover, the fact that Merritt might be involved in some illegal activity involving a large sum of currency is enough to raise a safety concern in an airport. Merritt's behavior over the next few minutes also justified investigation. Agent Aplin observed the passenger nervously making phone calls on his cell phone and overheard the comment, "They found it." Pursuant to his training, Agent Aplin determined that further investigation was necessary, and that a policeman should do it.[7] Accordingly, Corporal Green was quickly invited into the situation.

Upon hearing that Merritt would not explain the currency and was acting extremely nervous, Corporal Green agreed that further inquiry was necessary, and invited Merritt to follow him to his office eight feet away.[8] Merritt voluntarily followed Corporal Green. Scarcely two minutes had expired since Merritt submitted his bag to the search at the security checkpoint.[9] Corporal Green did not seek to search Merritt further but did seek to question him regarding the origin of the currency. A reasonable officer in Green's position would have held a specific suspicion that the currency was being transported via airline as part of an illegal activity. That suspicion would be based upon trustworthy information,

---

[7] In a case involving detention of an unopened briefcase at an airport security checkpoint, the Second Circuit held: "In short, so long as the airport security personnel had reasonable suspicion arising from the facts known to them, the brief detention of claimant's luggage was proper in order to allow trained police officers to quickly confirm or dispel that suspicion." *United States v $555,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 86-87 (2d Cir. 2002) (citation and internal quotation marks omitted).

[8] This course of action was reasonable. Having reviewed the security tape of the area, the court takes judicial notice of the narrowness of the passage in which the former security checkpoint was located at the Montgomery Regional Airport and of the inconvenience and potential embarrassment to be caused to a passenger by being questioned in that small, very public space. *See also United States v. Lopez-Pages*, 767 F.2d 776, 779 (11th Cir. 1985) (finding that moving the plaintiff from the general security area to a private office before a search was conducted minimized, rather than enhanced, the intrusiveness of the search).

[9] There is no evidence of coercion, but Merritt was separated from his carry-on bag and shaving kit.

12

available to Corporal Green at the time:[10] (1) Merritt had a large sum of cash in his carry-on bag; (2) Merritt was traveling to a drug source city; (3) Merritt would return in less than 24 hours; (4) Merritt was dressed in shorts and tee shirt, not in business attire; (5) Merritt became nervous and otherwise acted suspicious when the cash was found; (6) the cash was found in plain view during an authorized search; (7) when the cash was discovered, Merritt began making telephone calls, which persisted as he followed Corporal Green into the office; (8) Merritt was overheard to say, "They found it;" (9) Merritt had initially given an unsatisfactory response to the TSA agent with respect to the cash found in plain view; (10) the denominations were twenties and fifties, a fact which is an indicator of drug-related cash; (11) the way the money was packaged could have been an indicator of drug-related cash; and (12) carrying large amounts of money in a shaving kit is unusual. Thus, the court finds that the suspicion was both reasonable and articulable, and the detention by Corporal Green of the cash and the bag from which it came was likewise justified under *Terry*.

Based on the testimony presented at the motion hearing, the court assumes without deciding for the sake of this analysis that the detention of Merritt began, at the earliest, as he was questioned in Corporal Green's office. On first blush, taking Merritt to the police office might seem analogous to *Royer*, in which the taking of the defendant into a large closet-like room with a desk and two chairs was decisive in the Supreme Court's holding that the defendant had been *de facto* arrested. *Royer*, 460 U.S. at 501-02. In that case two officers accused *Royer* of smuggling drugs, took him to what appeared to be an interrogation room, retrieved his checked luggage, and held his identification and ticket. Here, however, rather than accusing Merritt of a crime, the officer asked him simply to explain why he had

---

[10] Totality of the circumstances includes the collective knowledge of all officers involved in the stop. *One Ford F150 Pickup*, 148 F. Supp. 2d at 1261.

13

such a large quantity of money. Moreover, safety and security reasons, and the pragmatic reason of questioning Merritt in a calmer and less crowded setting, justified moving him a short distance away from the security checkpoint, given his suspicious conduct. Green told Merritt that he was not under arrest. Green testified that he did not specifically tell Merritt "you can leave right now," but "he did know that he was free to go." (Tr. 75.)

Corporal Green's questioning of Merritt commenced in his office. Unfortunately for Merritt, his responses, or absence thereof, only heightened Corporal Green's suspicion. Merritt was nervous and stammering. Unable to give specific details, Merritt provided an implausible real estate transaction story to Corporal Green. To this point, Corporal Green had only looked in the shaving kit where the cash was found in plain view, but he also had possession of the carry-on bag.

As noted above, in the meantime Agent Aplin was retrieving Merritt's traveling companion, Coleman, from Gate 4. The totality of the circumstances soon changed drastically, and not to Merritt's benefit, when Coleman twice attempted to flee. According to the surveillance tape, the attempted flight occurred five minutes and thirty-eight seconds from the time Merritt walked into the office with Corporal Green. Corporal Green soon learned from Officer Fitts that Coleman, too, was carrying large sums of money and acting "nervous and fidgety." Coleman's story was that he was on the way to San Antonio to "buy some shoes and shirts for opening up a business" and that he and Merritt had driven to the airport together. This story was inconsistent with Meredith's.

The court finds that reasonable suspicion of Merritt and his cash ripened into probable cause to seize the cash when Coleman twice attempted to flee. What had begun as a security issue with the TSA agent was beginning to change character under the questioning of Corporal Green to suspicion of drug-related cash. However, at that point, Corporal Green had not expanded the scope of the search

– he testified he was focused on the shaving kit. The totality of the circumstances changed drastically, and reverted to a significantly heightened airport security issue, when Coleman fled back through the security checkpoint into an unsecured area of the airport, leaving roughly eighty thousand dollars in cash behind.[11] The exigencies of the situation faced by Corporal Green, including unknown but potentially harmful substances yet uncovered in the carry-on bags,[12] as well as the likelihood of the disappearance of the cash if the men were released, compelled seizure of the cash and a thorough completion of the searches of both carry-on bags.

Attempted flight, standing alone, does not establish probable cause. *Illinois v. Wardlow*, 528 U.S. 119 (2000). Unexplained possession of large amounts of cash, without more, is likewise insufficient to establish probable cause even when a drug dog alerts on the cash. *Williams*, 267 F.Supp.2d at 1134-35; *United States v. $121,100*, 999 F.2d 1503, 1507 (11th Cir. 1993).[13] Proximity to a suspicious companion who has created "his own" probable cause does not, without more, impute the probable cause to the other. *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). Nervousness alone is insufficient for probable cause. *Royer*, 460 U.S. at 507. But all of these factors, and many others enumerated above, were not standing alone in this case. They marched like soldiers of suspicion, eventually overtaking the stronghold of probable cause. At the point of Coleman's second attempt to

---

[11] Having entered the security area, a passenger may not unilaterally attempt to leave the area to avoid the seizure of contraband. *See United States v. Aukai*, 440 F.3d 1168 (9th Cir. 2006) (holding that passenger impliedly consented to secondary search after walking through magnetometers that could not subsequently be revoked by electing not to fly; such a result would encourage airline terrorism by providing a secure exit where detection of contraband was imminent and thus undermine the purpose of airport security screenings).

[12] Though not mentioned in testimony, another objective circumstance was the possibility of a bomb or poisonous substance, e.g., anthrax, in Coleman's abandoned bag. This possibility is an objective consideration the court may credit to the probable cause analysis. *See Craig v. Singletary*, 127 F.3d 1030, 1042-43 (11th Cir. 1997) (holding that courts should decide probable cause issues on an objective basis).

[13] But "it is a significant fact and weighs heavily in the probable cause calculus." *$242,484.00*, 389 F.3d at 1161.

flee,[14] during which he abandoned roughly eighty thousand dollars in cash, probable cause existed to seize the cash and to complete a thorough search of the carry-on bags of both men.

Merritt complains that the detention ripened into a *de facto* arrest well before the marijuana and extra cash were discovered in his bag, that the completed search of his carry-on bag was therefore illegal, and that the fruits of the search should therefore be suppressed. Having found that probable cause existed much earlier in the encounter, when Coleman fled the scene, this argument is without merit. Upon consideration of all the circumstances, the currency seized from Merritt will not be suppressed. Seizure of the currency from Merritt was based upon probable cause.

B.   *Claimant Coleman*

Most of the analysis applicable to Merritt applies to Coleman and will not be repeated. Because of Coleman's flight attempts, he argues that the "forced march" from Gate 4 back to the security checkpoint was both involuntary and without reasonable articulable suspicion, therefore an illegal seizure and not a *Terry* detention. (Claimants' Br. 5.) It follows, argues Coleman, that his attempts to flee were in avoidance of an attempted illegal arrest by airport police. On the evidence before it, the court finds that these arguments lack credibility.

Coleman initially made it through the security checkpoint and to Gate 4. Less than ten minutes later he twice attempted to flee. What happened in that ten minute period is not in dispute. Within three to four minutes of the release of Coleman at his initial security checkpoint encounter, Agent Aplin and his lead officer, Ronald Steele, approached Coleman as he appeared to doze in the passenger area of Gate 4, a secure area of the airport. On direct examination, Agent Aplin testified:

---

[14] A guilty man runs when no one pursues. *See* Proverbs 28:1.

    A.       I told Mr. Coleman I needed for him to follow me back downstairs because we needed to do another search of himself and his property, just to make sure that everything is clear.
    Q.       Did he go willingly with you?
    A.       Yes, he did.[15]
    Q.       Did you have to use any force to get him to accompany you?
    A.       No, I did not.

(Tr. 18-19.) On the evidence before it, the court finds nothing coercive about Coleman's return to the security checkpoint. Indeed, it was voluntary.

Agent Aplin further testified as to his intentions:

    A.       Two individuals traveling together, even though one may clear, the other one acting suspiciously, out of the ordinary for a passenger, then I have to, quote-unquote, think outside of the box that is it possible that he may be hiding something that we hadn't found. Did his traveling companion have something that we may not have found? So in order for me to feel comfortable about allowing Mr. Coleman on the plane, I decided to do an additional search of him and his property to satisfy me of allowing him onto the plane.

  . . .

               Like I said, because of the suspicious behavior that Mr. Merritt was showing, then I wanted a person who had more knowledge and expertise in questioning an individual to step in and take over for both to maybe try to figure out if something indeed was there or maybe not there.

  . . .

    Q.       Okay. Then what would have been the need to come back and do this all over again?
    A.       To look for other items that may be of interest to us that we may deem that could be damaging to an aircraft. And not just an incendiary or explosive. . . . So different things that we were looking for that may or may not have been caught on the X-ray and may or may not have been caught during the additional screening process.
    Q.       Does TSA have a certain amount of times that – is there a policy through TSA of how many times that you subject a person to this sort of additional screening?
    A.       No. We conduct our searches and our screening process up to the point that we feel comfortable with either an individual or a piece of luggage or carry-on item, that it is safe to allow onto an airplane.

---

[15] On cross examination, Agent Aplin added that Coleman said "No problem" as he got up to follow the agents. (Tr. 46.)

17

(Tr. 46-48.) Upon arriving back at the security checkpoint, Aplin searched Coleman's bag again and discovered a large amount of cash rolled up in various pieces of clothing. It was immediately after the discovery by Aplin of the cash that a law enforcement officer took possession of Coleman's bag and Coleman, and walked toward the police office. It is not clear from the evidence, including the security video, what happened to this law enforcement officer, but when the second flight attempt occurred, Officer Fitts left his station at the monitor and retrieved Mr. Coleman from the airport lobby.

As has been established with respect to Merritt, Agent Aplin had the following verified facts and circumstances based upon trustworthy information at the time Coleman was asked to return to the security checkpoint: (1) Merritt, Coleman's traveling companion, had a large sum of cash in his carry-on bag; (2) Coleman was traveling to a drug source city; (3) Coleman would return in less than twenty-four hours; and (4) Coleman was traveling with Merritt who had purchased his, Coleman's, ticket and who became nervous and otherwise acted suspicious at the security checkpoint. Factors (1) and (4) were direct security issues. Agent Aplin articulated a legitimate law enforcement purpose related to airport security to justify his request to Coleman. The court finds, based on the totality of these circumstances, that the airport authorities had reasonable, articulable suspicion to detain Coleman for a further, brief investigation and to complete the search of his person and bag. *After* the additional search, Agent Aplin had the benefit of more suspicious circumstances: (5) a large amount of cash was found during an authorized search of Coleman's bag; and (6) the money in Coleman's bag was obviously intentionally hidden to avoid detection.

The court is inclined to find that probable cause to seize at least the cash existed after the bag search, but it is not necessary to make that determination in view of Coleman's two flight attempts, which occurred within approximately one minute of the search. Clearly, when Coleman fled through

the security checkpoint, running, abandoning his bag and its approximate $80,000, probable cause existed to seize Coleman and his bag for a more thorough search of both. The scope of the search would accordingly be expanded, primarily because Coleman himself escalated the security concerns of the airport authorities, resulting in greater yet justified intrusions on his privacy interests and possessory interests in his carry-on bag.

During Officer Fitt's search of the person and effects of Coleman, more cash was located, both on his person and in his carry-on bag. The court finds this search was an expansion of the search commenced by Agent Aplin, and that it was conducted with probable cause. The cash will therefore not be suppressed.[16]

### III. CONCLUSION

Because probable cause existed to seize the currency of claimants Merritt and Coleman, the Motion to Suppress (Doc. # 29) is DENIED.

DONE this 6th day of February, 2007.

        /s/ W. Keith Watkins
        UNITED STATES DISTRICT JUDGE

---

[16] In oral arguments and briefing, Coleman makes much of the seizure of his person and of the fact that no criminal charges were pressed against him. *Place* is instructive on this point. The unlawfulness of the detention of the *person* in *Place* was immaterial to the analysis of the seizure of the *property* of Mr. Place at the airport. *See Place*, 462 U.S. 696 n.1. What happened or did not happen with respect to Coleman's *person*, after probable cause to seize the cash existed, is of no consequence in the analysis of the seizure of the cash.