IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| PLAINTIFF, | : |
| v. | : CIVIL ACTION NO. 2:05cv1086-WKW |
| EIGHTY THOUSAND SIX HUNDRED THIRTY-THREE DOLLARS ($80,633.00) IN UNITED STATES CURRENCY; FOUR THOUSAND EIGHT HUNDRED SEVENTY-EIGHT DOLLARS ($4,878.00) IN UNITED STATES CURRENCY; AND, THIRTY-SIX THOUSAND FIVE HUNDRED DOLLARS ($36,500.00) IN UNITED STATES CURRENCY, | : |
| DEFENDANTS. | : |

POST TRIAL BRIEF

The United States of America (United States), by and through Leura G. Canary, United States Attorney for the Middle District of Alabama, and John T. Harmon, Assistant United States Attorney, hereby submits the following brief:

**I.  BURDEN OF PROOF**

At trial, counsel for the Claimants argued that the United States must establish, by a preponderance, that there is a substantial connection between the property and an offense giving rise to forfeiture.

The United States contends that Title 18, United States Code, Section 983(c)(1) establishes the burden to be upon the government, by a preponderance of the evidence, to establish ... "that the

property is subject to forfeiture." Title 18, United States Code, Section 983(c)(3) sets the burden upon the government to establish "... a substantial connection between the property and the offense" only when the theory of forfeiture is that the property "was used to commit or to facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense..."

The present case is brought under Title 21, United States Code, Section 881(a)(6) which mandates the forfeiture of money furnished or intended to be furnished in exchange for a controlled substance, all proceeds of such an exchange and money used or intended to be used to facilitate a violation.

Proceeds cases such as this are decided upon the standard established by Title 18, United States Code, Section 983(c)(1). See U.S. v. $21,000, 298 F.Supp.2d 597, 601-02 (E.D. Mich. 2003) citing also U.S. v. $118,170, 69 Fed.Appx. 714, 717 n.1 (6th Cir. 2003). A substantial connection need not be shown.

However, even under the higher "substantial connection" burden, the United States has shown that the property is subject to forfeiture.

II. **ESTABLISHED FACTS AND CITATIONS OF AUTHORITY WITH ARGUMENT**

    A.    **The United States, At Trial, Established The Following Facts By A Preponderance Of The Evidence.**

        1.    Claimant Merritt purchased airline tickets using cash for himself and Claimant Coleman for a same-day flight from Montgomery to San Antonio on July 6, 2005.

2. A TSA supervisor, ("Aplin") saw Coleman and Merritt enter the airport security checkpoint together.

3. Coleman was first through the checkpoint with a carry-on bag and was selected for additional screening. After screening, Coleman was allowed to proceed to the gate.

4. Merritt was next at the checkpoint and was also selected for additional screening.

5. A search of Merritt's carry-on bag revealed a large amount of currency in his shaving bag. Upon discovery of the cash, Merritt made a call or calls on his cell phone, became visibly nervous, and paced around the screening area. During a call, Merritt stated, "They found it."

6. An initial examination of the currency determined that the amount probably exceeded $10,000, the amount which would have to be declared for international travel.

7. Aplin reviewed Merritt's itinerary and determined that he was flying to San Antonio on an 11:35 a.m. flight and returning to Montgomery around 6:15 the next morning. Merritt's behavior aroused Aplin's suspicion and he summoned his supervisor, Agent Jackson, and an airport police officer, Corporal Green.

8. Corporal Green examined the currency and found it was encircled by bank bands, with rubber bands underneath the bands. The denominations of the cash was twenties and fifties. The

currency was bundled in a manner consistent with the bundling of drug sales proceeds.

  9. Corporal Green took control of the bag and the currency and had Merritt follow him to an office near the screening area.

  10. Corporal Green asked Merritt why he was carrying such a large sum and noticed that Merritt was nervous. Merritt said he was going to do some business with it, to buy some property, and that he was involved with real estate.

  11. Merritt gave Corporal Green the name and phone number of an individual whom he said he worked with in his business. Upon contact, this individual agreed to send a fax regarding this business. The fax arrived approximately twenty minutes later but only established that Merritt had loaned an individual money. The document did not appear to be the stationary of a business, but rather something hastily put together on a computer.

  12. Merritt told Corporal Green that he was brought to the airport by his mother. In fact, Merritt and Coleman traveled to the airport in a vehicle.

  13. Aplin recalled that Merritt was traveling with a companion (Coleman) and wanted to do conduct an additional aviation threat search upon Coleman based upon Merritt's suspicious behavior.

4

      14.   Coleman was located at Gate 4 and was requested to return to the security checkpoint. Coleman voluntarily returned to the security checkpoint, where a further search of Coleman's bag resulted in the discovery of large amounts of cash secreted in his clothes. Another law enforcement officer took control of Coleman's bag and Coleman was directed toward the office where Corporal Green was questioning Merritt.

      15.   Officer Robby Fitts of the Montgomery Regional Airport Police was operating the monitor room when Coleman was directed to the police office. Using a security camera, Officer Fitts observed Coleman approach the door to the office following Aplin. Coleman hesitated coming into the office and took several steps away from the door. A female officer at the security checkpoint stopped Coleman and directed him back to the office. Coleman came back to the door, hesitated and attempted to flee the area. Officer Fitts observed Coleman make physical contact with the female officer as he attempted to flee. Fitts pursued Coleman, twice ordered Coleman to stop, and caught him thirty to forty feet outside the security checkpoint in the airport lobby. Officer Fitts took control of Coleman and returned him to the office.

      16.   Corporal Green, still questioning Merritt, was aware of Coleman's attempt to flee. He directed Officer Fitts to question Coleman in another room. Officer Fitts attempted to "pat down" Coleman for officer safety purposes, but Coleman was

fidgeting and would not be still.  For his safety, Officer Fitts handcuffed Coleman behind his back.

      17.  An additional search of Coleman found money tucked in his jeans and in the pocket of his jeans.  Coleman stated that he was going to buy shoes with this money.  Officer Fitts stacked the money on the table near Coleman and Coleman told Officer Fitts to get some of this money so that law enforcement would not get it.  During this time, Coleman attempted to stuff some of the money behind training materials on the bookshelf in the office.

      18.  Coleman told Officer Fitts that he and Merritt drove together to the airport.

      19.  Drug Enforcement Administration (DEA) Drug Task Force Agents Larry Hubbard and Steven Brock arrived after being called by Corporal Green.

      20.  These agents were briefed about the situation.  Agent Hubbard first interviewed Merritt who stated that the primary reason for the trip was to purchase real estate.  Merritt then added that he would also perhaps purchase a vehicle in San Antonio.  Merritt told Agent Hubbard that he knew about property in a lower income housing area that he could buy and flip for a profit and that he sometimes did such transactions on the internet.

21. When asked, Merritt was unable to identify an internet site or give the name of a real estate agent or any information concerning the real estate business or the purchase of real estate in San Antonio.

22. Merritt stated that he did not know where he would be staying, perhaps with a girlfriend or a female friend, or maybe with another male individual who did not even know he was coming.

23. Merritt was very casually dressed in shorts and a tee shirt.

24. A drug detection dog, Pyro, alerted on Merritt's bag and on the currency on the table. An alert means that the dog has detected that the object has been exposed to illegal drugs.

25. Merritt's bag was searched and additional money and a very small quantity of marijuana (approximately 18 milligrams) was found therein. Merritt was searched again and more cash was found on his person.

26. The total amount of currency seized was $122,011. Currency was found hidden in the baggage and on the person of the claimants.

27. San Antonio, Texas is a "source city" for illegal drugs.

28. Merritt asserted that he was in business with an individual named Robinson.

29. Merritt loaned Robinson money at an interest rate of 25% due every month. Robinson paid this high rate even though he was a successful businessman involved in the purchase and sale of real estate. Merritt had done two "deals" with Robinson but could not recall exactly how much he made on each deal. The amount made was at least $10,000 and as much as $20,000.

30. Merritt admitted that he had earned between $10,000 and $20,000 in 2005 through his "investment" with Robinson but had not declared this income on his federal income tax return.

31. Robinson was not involved in Merritt's San Antonio venture and none of the money seized at the airport belonged to Robinson. However, when the cash in his shaving kit was found, he called Robinson on his cell phone.

32. Merritt had obtained $30,000 of the $41,378 seized from him at the airport the day before the flight. The money was given to him by Robinson at a bank. Merritt never stated where he got the additional $11,378.

33. Merritt, in his earlier deposition, stated that the money, obtained the day before seizure, was "all fresh, new money." (P.64, line 14 of December 19, 2006 deposition). The photographs of the money seized from Merritt showed that the money was not new, was bundled in various manners and was enclosed by rubber bands and bank bands. Moreover, the money was of mixed denominations.

34. Merritt stated that he intended to stay with the mother of his children in San Antonio but could not recall her address on the date of seizure or at trial.

35. Merritt stated that he worked as a hotel clerk until some point in 2004 making $7.00-$8.00 an hour. He also received funds through the GI Bill, disability and unemployment. During that same period he was supporting between five to seven children.

36. Merritt obtained the $41,378 seized from him by savings, a loan from his uncle and money made with Robinson. Neither the uncle or Robinson were called to the stand. No documentation of income, loan receipts or investment income were introduced by the claimant other than the purposed "loan document" sent to the airport on the date of the seizure.

37. Merritt has attended college but has not graduated.

38. Merritt has never purchased real estate before.

39. Merritt is currently unemployed.

40. Merritt had a bank account in San Antonio, Texas at the time of the seizure. Merritt also possessed money orders at the airport. The money orders were obtained to pay his child support.

41. Merritt brought the duffle bag, in which the small quantity of marijuana and some cash were found, to the airport. The bag belonged to a friend. He never knew the friend to be involved in illegal drugs in any manner.

42. Claimant Coleman introduced no evidence or testimony.

**B.  Citation of Authority with Argument.**

1. In this case, the burden of proof is upon the government to establish, by a preponderance of the evidence, that the seized cash was furnished or intended to be furnished in an exchange for illegal substances or that it is the proceeds of such an exchange; or that it was used or was intended to be used to facilitate a violation of the drug laws of the United States. Title 18, United States Code, Section 983(c) and Title 21, United States Code, Section 811(a)(6).

2. When evaluating evidence linking seized cash to the illegal drug trade, the court must eschew "clinical detachment" and endorse "a common sense view to the realities of normal life applied to the totality of the circumstances." U.S. v. $242,484.00, 389 F.3d 1149, 1160 (11th Cir. 2004). See also U.S. v. Funds in Amount of $30,670.00, 403 F.3d 448, 467 (7th Cir. 2005).

3. The "common sense reality of every day life is that legitimate businesses do not transport large quantities of cash rubber-banded into bundles and stuffed into packages in a back

pack" while traveling via scheduled air service. Drug rings commonly "utilize couriers to transport in cash their ill gotten gains ..." $242,484.00 at 1161.

    4.   The fact that the destination of these claimants is a drug "source city" coupled with the large amount of cash being carried, the cash purchase of the airline tickets, and the short duration of the trip are significant factors demonstrating a connection to illegal drug sales. $242,484.00 at 1162-63; U.S. v. Funds in Amount of $30,670.00 at 467-469.

    5.   The conflicting stories given by the claimants regarding how they got to the airport and the purpose of their trip also demonstrate the connection between this cash and illegal drug dealing. $242,484.00 at 1164. Moreover, it is beyond belief that any person would believe that he could arrive in a city in mid-afternoon, find a house to purchase, negotiate the sale, go through the closing and then sell the property by 6:00 a.m. the next day.

    6.   The dog alert also shows a strong connection between the seized currency and illegal drugs. $242,484.00 at 1165-66; $30,670.00 at 455-464 and 469.

    7.   The suspicious actions of both claimants when confronted by law enforcement also shows that they were aware that they were transporting ill-gotten gains. Merritt's actions when the cash was found in his shaving kit and Coleman's attempts to flee are strong indicators of a drug connection to the currency.

8. A very small quantity of marijuana was discovered in Merritt's bag. The discovery of even a small amount of illegal drugs in proximity to the seized currency is probative of a connection to illegal drugs. See U.S. v. $84,615.00 in U.S. Currency, 379 F.3d 496, 501-502 (8th Cir. 2004). This marijuana is also probative against Coleman's claim based upon the overwhelming evidence that they were traveling together for a joint purpose.

9. The amount of currency seized is "strong evidence" connecting the seized cash to illegal drug activities. U.S. v. $117,920.00 in U.S. Currency, 413 F.3d 826, 829 (8th Cir. 2005).

10. The seized cash does not have to be traced to a particular drug transaction only that the cash was related to some illegal drug transaction. $242,484.00 at 1160.

11. The United States notes that U.S. v. $242,484.00 was decided under the old probable cause standard which is not applicable to this case. However, case law on forfeitability decided on the probable cause standard is applicable to preponderance standard cases. The factors that weighed in favor of forfeiture in the past continue to do so now. $30,670.00 at 469-70.

12. The United States would also move the Court to consider that Coleman did not offer evidence or testimony. Although he filed a claim, Coleman did not take actual steps to assert his claim.

> A large sum of legitimate cash always has one or more proud parents but drug money, once it is seized by law enforcement, is often treated like an orphan child. $242,484.00 at 1167.

Coleman may have initially claimed the "child" but he quickly gave it up for adoption. This factor is strong evidence of the illegal nature of the money.

13. Merritt's testimony is not credible. He would have the Court believe that he obtained fresh, new money from a bank on July 5 and that by the next day the money appeared old, circulated, had to be re-packaged using rubber bands and was of mixed denominations. Further, his story regarding the purpose of the trip is simply unbelievable.

14. Claimant Coleman introduced no evidence. Even if the overwhelming amount of evidence introduced by the United States was reduced by 90%, it would still be a preponderance because Coleman has no evidence on his side.

15. Merritt provided no corroboration for his story. Neither his uncle or Robinson, the alleged source for much of the seized cash, testified. Moreover, he provided almost no documents to substantiate his assertions.

16. Based upon the totality of the circumstances as shown and the real world view the Court should take, the United States has shown, by a preponderance, that the Defendant currency is subject to forfeiture.

FOR THE UNITED STATES ATTORNEY
LEURA G. CANARY

/s/John T. Harmon
John T. Harmon
Assistant United States Attorney
Bar Number: 7068-II58J
Office of the United States Attorney
Middle District of Alabama
One Court Square, Suite 201
Montgomery, Alabama 36104
Telephone:(334) 223-7280
Facsimile:(334) 223-7560
E-mail: John.Harmon@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2007, I electronically filed the foregoing Post Trial Brief with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: **Joe M. Reed.**

/s/John T. Harmon
John T. Harmon
Assistant United States Attorney