**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| **PLAINTIFF,** | * | **CV-05-1086-WKW** |
| **VS.** | | |
| | * | |
| | * | |
| **EIGHTY THOUSAND SIX HUNDRED** | | |
| **THIRTY-THRREE DOLLARS** | * | |
| **($80,633.00) IN UNITED STATES CURRENCY;** | | |
| **FOUR THOUSAND EIGHT HUNDRED** | * | |
| **SEVENTY-EIGHT DOLLARS ($4,878.00)** | | |
| **IN UNITED STATES CURRENCY; AND** | * | |
| **THIRTY-SIX THOUSAND** | | |
| **FIVE HUNDRED DOLLARS ($36,500.00)** | * | |
| **IN UNITED STATES CURRENCY** | | |
| | * | |
| **DEFENDANTS.** | * | |

**Brief in Support of Motion to Dismiss or Motion for Judgment as a Matter of Law**

Now come the claimants, by and through the undersigned and hereby show unto this

honorable court that the $80,633.00 seized from Michael Coleman and $41,378.00 seized

from Jacquard Merritt by agents of the United States of America  are not subject to

forfeiture under 21 U.S.C. 881(a)(6).  The primary issue before the court is the claimants'

use of the seized funds.    The government has merely shown a suspicion that the funds

are subject to forfeiture and has not shown by a preponderance of the evidence that the

seized funds are subject to forfeiture- in that the funds are proceeds of an illegal exchange

for drugs, or proceeds intended to be furnished or exchanged  for drugs or proceeds of

drug trafficking. The government's case is highly dubious as the claimants are not

charged with a controlled substance crime involving the use of the money to purchase

drugs, or sell drugs.  The allegation that the funds were intended to be furnished for

drugs, under the following facts, is based on pure speculation and conjecture.  As grounds

for such conclusion the claimants show the following.

**FACTS**

On or about July 5, 2005 at an unknown time in the mid-morning, Michael

Coleman and Jacquard Merritt arrived at the Montgomery Regional Airport to take a trip

to San Antonio, Texas.  Coleman and Merritt used cash to purchase round trip tickets in

their true names for a flight leaving roughly at 11:30 a.m. and returning in the early

morning the next day.  Coleman and Merritt did not check any luggage and carried two

duffel bags. After receiving their boarding passes, Coleman and Merritt presented

themselves at the initial security checkpoint where TSA agents compared the names on

the boarding passes with the names on their identifications.  Seeing no discrepancies,

both individuals were handed back their boarding passes and allowed to proceed to the

screening area.  There, Coleman and Merritt placed their carryon luggage on the x-ray

machine conveyor belt where it passed through without issue.  Both Coleman and Merritt

walked through the metal detector without setting off the alarm.  For an unknown reason,

both Coleman and Merritt were selected to be "secondarily screened".  Coleman went

first where he handed over his boarding pass to a TSA agent and was scanned with a

hand held metal detector and subsequently patted down.  Finding no weapons, contraband

or device which could bring a plane down, Coleman was handed back his boarding pass

and permitted to retrieve his blue carry-on.  Coleman then proceeded to the gate area

without further issue.

Merritt followed Coleman and upon Merritt's screening he also handed his boarding pass over to the TSA agent where he was scanned with a handheld metal detector and patted down as well. The search of Merritt did not reveal any contraband, weapon or any device that could bring a plane down. As Merritt's carry-on bag passed through the x-ray machine, it was retrieved by TSA agent Aplin. Aplin physically searched Merritt's carry-on and the shaving kit inside. The physical inspection of the shaving kit did not reveal any contraband or any item that could bring a plane down, however, it did reveal an unknown amount of cash.

After spotting the cash, TSA agent Aplin summoned his supervisor, TSA agent. Jackson and Airport Police Officer Green and turned the shaving kit containing the cash as well as Merritt's boarding pass over to them. Jackson and Green thumbed through the money and presumed that it may be around $10,000. Jackson and Green maintained control over Merritt's shaving kit and boarding pass and instructed him to go into a secured office within the airport. Merritt took hold of his carryon and did as Green and Jackson instructed and proceeded into a secure room adjacent to the concourse. There, Green and Jackson questioned Merritt regarding the source and the purpose of the money. Green told Merritt if he could prove that the money came from a legitimate source, he could go on about his business. Green received a phone call and a fax purportedly explaining the source of the money as well as its legitimacy, however according to Green, the documentation did not satisfy him. Green continued to question Merritt regarding the source and intended use of the money. Merritt gave several explanations as to why he was carrying the sum of cash and its intended use. Merritt stated that he received the money as a result of a real estate transaction and was going to use the money to purchase

some real estate, and perhaps buy a car while in San Antonio.   None of these explanations satisfied Officer Green.  Green then searched Merritt's carry-on (which originally contained the shaving kit) without his consent and without a warrant, where an additional larger sum of cash was revealed.  Officer Green then contacted the Drug Enforcement Agency for assistance.

During Merritt's detention, TSA agent Aplin discovered that Merritt was traveling with a companion, Michael Coleman.  Aplin and an unidentified Airport police officer located Coleman in the upstairs portion of the gate area.  Coleman was accosted by Aplin and the unknown Airport Police Officer and told that he needed to be re-screened and was instructed to accompany agent Aplin and the officer downstairs for that purpose. Aplin took hold of Coleman's blue carry-on and boarding pass and marched him downstairs, as he (Aplin) followed behind.  Coleman was not led back to the x-ray machine, but instead was led to the secure room adjacent to the concourse.  As Coleman was instructed to enter the secure room, he turned toward the ground transportation exit and attempted to leave, but was instructed by another TSA agent to go inside the secure room.  Coleman returned towards the secure room and began walking toward the door when he suddenly turned around and attempted to leave for the second time.  A TSA agent attempted to cut Coleman's route of egress, however Coleman's quick feet enabled him to get past the agent.

Coleman was pursued by airport police a short distance inside the terminal where he stopped and turned around either as a response to their command or on his on volition. Airport police seized Coleman by the arm and marched him into the secure room.

Once inside the secured room, Coleman was handcuffed and sat in a chair. Without Coleman's consent or a warrant, Coleman's duffel bag was searched by Airport Police and TSA agents revealing a substantial amount of cash. Coleman was asked questions regarding the cash; however he refused and asked for a lawyer.

Sometime within 45 minutes to an hour of the seizure of Coleman, agents from the Drug Enforcement Agency arrived to question Coleman and Merritt. Coleman repeated the same story to the DEA agent as he told Airport Police. The contents of both Merritt's carry-on and Coleman's carry-on were displayed on a table and subjected to a dog sniff. The drug sniffing dog alerted to the cash of both Coleman and Merritt and on Merritt's carry-on. Agents found marijuana residue in Merritt's carryon, but nothing in Coleman's carry-on.

The cash was counted by DEA agents and receipts issued to both Coleman and Merritt. Both individuals were later released that day. As filing of the forfeiture action, neither Coleman nor Merritt have been charged with a controlled substance violation in connection to the cash.

The DEA seized the currency for forfeiture purposes under 21 U.S.C. Section 881(a)(6) averring that the cash was derived from and or intended to be used in a controlled substance crime.

At trial, government did not call any witnesses but rested on the testimony adduced at the suppression hearing. The claimants moved to dismiss the case as failing to show by a preponderance of the evidence that the property was subject to forfeiture. The court carried the claimant's motion and the Claimants called Jacquard Merritt to testify.

Jacquard Merritt testified that his seized currency were proceeds from a real estate investment with Dominique Robinson or A&D Finance,  in which he agreed to lend Dominique Robinson $20,000 in exchange for a repayment of $25,000 and/or $5,000 per month, until the debt was paid.  Merritt produced documentation of the arrangement. Although Merritt carried roughly $41,000 at the airport, he stated that he $30,000-35,000 of the $41,000 came from Dominique Robinson two days prior to the seizure and represented not only the repayment of his documented investment but a partial payoff from a previously un-documented investment with Robinson.  Merritt explained the source of his "seed money" as originating as a loan from a relative.  The government was unable to impeach the story as false.  Merritt testified that he was not on drugs, did not do drugs, had no drug arrests, and did not recognize marijuana residue.  Merritt testified that he did not go to San Antonio to purchase drugs, nor did his cash come from drug dealing. Coleman did not testify. The record does not reflect that Coleman is on drugs, does drugs, is a drug dealer, has been arrested for drug dealing, that his seized currency is the product of an exchange for drugs, has drug connections in San Antonio, manufactures drugs or that he was going to San Antonio, Texas to buy drugs.

Government witnesses were called by the claimants and they admitted that they had never seen or been in contact with Coleman or Merritt's cash prior to the seizure, and that is was not marked "buy money".  The government witnesses admitted that they could not establish that the seized funds from Coleman and Merritt were proceeds of an exchange for drugs, or that the seized funds were to be furnished for drugs, or that the seized funds, were proceeds from the sale, manufacture, or distribution of drugs.  The DEA case agent specifically admitted that there was no other government witness on the ground in San

Antonio, Texas who was to exchange drugs for the currency Coleman and Merritt

carried, and knew of no one on the ground in San Antonio who was to do such.

## **CONCLUSIONS OF LAW**

Forfeitures, the seizure of a citizen's property, are "strong medicine, disfavored in

our jurisprudence." U.S. v. One Parcel of Real Property, 964 F.2d 1244, 1248 (1st Cir.

1992).  Forfeiture statutes are not favored but "should be enforced only when within both

the letter and the spirit of the law.  Forfeiture statutes are to be strictly construed against

the government." United States v. One 1936 Model Ford V-8 Deluxe Model Coach 307

U.S. 219, 226 (1939); U.S. v. 1992 Ford Mustang 73 F.Supp. 2d 1131 C.D. Cal. 1999.

"When forfeiture statutes are viewed in their entirety, it is manifest that they are intended

to impose a penalty only on those who are significantly involved in a criminal

enterprise."  U.S.v. U.S. Coin and Currency 401 U.S. 715, 721-722, (1971). Property is

subject to forfeiture when (1) it is furnished or intended to be furnished in exchange for a

controlled substance, (2) it represents proceeds traceable to such an exchange, or (3) it is

used or intended to be used in illegal drug-trafficking.  21 U.S.C. 881 (a)(6). The

evidence requires more than mere suspicion but less than prima-facie proof.  See U.S. v.

$364 960 in U.S. Currency, 661 F.2d 319, (5th Cir. 1981), U.S. v $191,000 in U.S.

Currency, 999 F.2d 1503; United States v. One 1979 Porsche Coupe, 709 F.2d 1424 (11th

Cir. 1983).  United States v. $364,960 in United States Currency, 661 F.2d.319 323 (5th

Cir. 1981).

In civil forfeiture proceedings brought under this section[1], the Civil Asset

Forfeiture Reform Act of 2000 controls the allocation of the party's burdens of proof.  At

the outset the government must show by a preponderance of the evidence that the

property is subject to forfeiture. 18 U.S.C. 983 (c)(1). And that there is a substantial

---

[1] 21 U.S.C. 881 (a)(6)

connection between the property and the underlying offense. 18 U.S.C. (c)(3). If the government makes this showing, the claimant shall have the burden of showing, by a preponderance of the evidence, that he or she is an innocent owner, in that the claimant did not know of the conduct giving rise to the forfeiture, or upon learning of conduct giving rise to forfeiture, the claimant did all that reasonably could be expected to terminate the use of such property. 18 U.S.C. 983 (d)(1). U.S. v. $21,510 in U.S. Currency, 292 F.Supp 318 (D. Puerto Rico 2003).

**Government's Contentions**

The government alleges that the seized funds are subject to forfeiture under 21 U.S.C.881(a)(6), yet the government has not put forth a theory to support its allegation as to how or why the funds are subject to seizure, or in what way the funds were used or being used to violate the named subchapter, i.e. 21 U.S.C. 841. Although the government argues for the forfeiture of the cash, no government witness testified as to the substantial connection between the cash and the underlying criminal activity. The government merely shows the court elements of the "drug courier profile", the cash itself, and a dog alert, as it relates to Coleman's $80,633; and the same factors plus marijuana residue and nervousness as it relates to Merritt's $4,878 and $36,500. Particularly the government presents the following aggregate facts to conclude that the defendant currency is subject to forfeiture.

1. THE PAYMENT OF TICKETS IN CASH
2. TRAVEL TO ALLEGED SOURCE CITY FOR DRUGS
3. STAY LESS THAN 24 HOURS
4. NO CHECKED LUGGAGE
5. AMOUNT OF CASH
6. DOG ALERT TO CASH
7. PACKAGING OF CASH-RUBBERBANDS AND BANK BANDS
8. FLIGHT-COLEMAN
9. IM PLAUSIBLEPURPOSE FOR TRIP

10. AVERRED CONFLICING STORY REGARDING ARRIVAL AT AIRPORT

Such facts may give rise to a degree of suspicion of criminal activity, but fall short of a preponderance of the evidence, in that it is more likely than not, that the funds seized from Coleman and Merritt were proceeds of an exchange for drugs or going to be exchanged for drugs. None of the government's witnesses or stand alone evidence showed a substantial connection between the seized funds and drug trafficking. The government avers the preceding factors are sufficient to show a substantial connection between the seized funds and drug trafficking. However, no evidence from the record shows that the seized funds were proceeds of an illegal drug exchange. And it is simply speculation that the seized funds were going to be used in an illegal drug exchange, as the government proffered no facts, circumstantial or otherwise of conduct indicating an exchange of the money for drugs. In order for the government to prevail, the government's case requires the court be brazenly cynical and use speculation, unsupported inferences, and engage in leaps of logic in order to meet its burden.

The Government relies primarily on U.S. v. 242,484.00 389 F.3d 1149 (11th Cir. 2004) to persuade the court to find that the facts in the present case warrant forfeiture of the seized funds. Although the case shares some similarities with the present case, its stark differences show why the funds are not subject to forfeiture.

In $242,484 the 11th Cir. held that the seized funds from an airline passenger were subject to forfeiture, under the old probable cause standard, primarily for the following aggregate circumstances.

1. The sheer amount of currency-the claimant, Deborah Stanford, carried $242,484.00
2. Packaging of the currency-lack of bank wrappers, only in rubber bands, mixed denominations in rubber bands
3. Currency sealed in cellophane-type material-known to prevent detection by drug-sniffing dogs
4. Currency further wrapped in Christmas paper-to avoid the detection of drug sniffing dogs and anyone who might open the bag.
5. New York-Miami-averred drug courier route
6. Changed departure date twice in two days-averred characteristic of drug couriers
7. Unable to identify individual(s) who gave her the money
8. Unable to say where she met people who gave her the money
9. Conflicting stories as to how she came to be in New York and purpose of trip
10. No documentation to support claimant's story
11. Alert by drug sniffing dog
12. Business whose behalf the claimant claimed to transport the money came up in NADDIS as a possibly utilized for money laundering

The elements in the current case fall short of those elements in $242,484 which enabled the Court to find probable cause to forfeit the seized funds.

1. Coleman carried about one third of the amount Stanford carried; Merritt about one eighth.
2. Both Coleman and Merritt's cash, although secured with rubber bands, also had bank wrappers around most of the currency.
3. Neither Coleman's currency nor Merritt's currency was wrapped in cellophane bags or Christmas paper.
4. Neither Coleman nor Merritt changed their departure dates on the return trip.
5. Coleman and Merritt both claimed the money as belonging to them.
6. Coleman and Merritt gave plausible reasons for going to San Antonio, the reasons did not conflict, as to be mutually exclusive. Neither person changed their story, nor could law enforcement impeach the story.
7. Merritt explained the source of his money, and supported it with documentation
8. Neither Coleman nor Merritt were "NADDIS" positive.

The only similarities are alleged travel to source cities and alert by dog. The factors in the current case are clearly on the lower side of the factors that gave rise to the Circuit Court's finding of probable cause in $242,484 indicating that the preponderance of the evidence standard is not met as well.

**Claimants Contentions**

Claimants categorically deny that their funds were used or going to be used in a manner rendering them forfeitable under 21 U.S.C. 881(a)(6). Claimants aver they broke no laws and had a right to purchase their tickets in cash, travel to San Antonio Texas, return when they wanted, carry whatever amount of cash they wanted, look for investment opportunities, and not disclose the origins of their currency and purposes of their trip to government agents, if they so chose. Claimants did not commit any drug trafficking offense using their money. Nor is the source of their money a drug trafficking offense. Any assertion to the contrary is based purely upon speculation.

Since there are few illustrative cases of forfeitures using the preponderance of the evidence standard under CAFRA, the claimants show, via the following illustrative cases under the lower standard of probable cause, why the defendant currency is not subject to forfeiture. If the facts do not meet the probable cause standard, they cannot meet the preponderance of the evidence standard.

**The Drug Courier Profile**

The drug courier profile is an informal compilation of characteristics by law enforcement of what they believe to be typical of persons unlawfully carrying narcotics. See Reid v. Georgia 448 U.S. 438, 440 (1980). Primary characteristics of the profile are:

> (1) arrival from or departure to an identified source city; (2) carrying little or no luggage, or large quantities of empty suitcases; (3) unusual itinerary, such as rapid turnaround time for a very lengthy airplane trip; (4) use of an alias; (5) carrying unusually large amounts of currency in the many thousands of dollars, usually on their person, in briefcases or bags; (6) purchasing airline tickets with a large amount of small denomination currency; and (7) unusual nervousness beyond that ordinarily exhibited by passengers.
> The secondary characteristics are (1) the almost exclusive use of public transportation, particularly taxicabs, in departing from the airport; (2) immediately making a telephone call after deplaning; (3) leaving a false or fictitious call-back telephone number with the airline being utilized; and (4) excessively frequent travel to source or distribution cities. U.S. v. Berry 679 F.2d 583, 599 (11th Cir. 1982).

In <u>Reid</u>, the Court held that the "drug courier profile" did not form the basis for reasonable suspicion of criminal activity to justify a *Terry* stop where the individuals stopped arrived from a "source city" in the early morning when law enforcement was at a low, tried to conceal the fact that they were traveling together, glanced back and forth at each other, and carried nothing but shoulder bags.  The Court went on to say that those characteristics described a very large category of innocent travelers, who would be subject to random seizures should the Court conclude that those factors could justify a seizure <u>Id</u> at 441.

Since the drug courier profile, standing alone, cannot justify a Terry stop, it cannot support forfeiture.

### <u>Elements of the Drug Courier Profile and Dog Alert found insufficient to warrant forfeiture-Coleman's $80,633.00</u>

The government attempts to show that Coleman's $80,633 is subject to forfeiture based upon his conformity with the drug courier profile.  The government proffers the purchase of his ticket in cash, round trip to a "source city" for drugs, a stay of less than 24 hours, the amount of currency, the bundling of currency in bank wrappers and rubber bands, and dog alert to the currency.  No contraband was found in Coleman's bag or on his person.  Coleman has no drug arrests; hence he has no drug convictions. No government witness nor stand alone evidence at trial indicated that Coleman was even suspected of being involved in narcotics transactions prior to the seizure of his cash. Although Coleman tried to run from airport personnel, and may have made some un flattering remarks as it pertained to the ultimate disposition of his cash, Coleman avers that the government's facts do not show anything more than mere suspicion that his funds

were proceeds of an exchange for drugs or were going to be exchanged or furnished for drugs. The United States District Court Northern District of Texas, the 6th Circuit Court of Appeals and the 5th Circuit Court of Appeals agree with Coleman.

In a case of nearly identical factors, and nearly an identical amount of money, the United States District Court in U.S. v. $80,760.00 in United States Currency, F.Supp. 462 (N.D. TX 1991), *aff'd* 978 F.2d 709 (5th Cir. 1992) stated that the

> Government did not demonstrate probable cause for forfeiture of currency recovered from airline passengers' luggage by showing that passengers exhibited characteristics of drug-courier profile, and that narcotics detection dog alerted to scent of narcotics on currency; profile characteristics are of little value in forfeiture context without other persuasive evidence establishing requisite substantial connection, and there was no evidence that passengers caused contamination of currency or that government agents verified dog's alert. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 511(a)(6), 21 U.S.C. 881 (a)(6).

Regarding the "drug courier profile" and probable cause for forfeiture, the District Court went on to state that

> An important distinction between the instant case and others discussing the profile is that the characteristics are normally used to justify brief investigatory stops, rather than probable cause for forfeiture. In this circuit it is well settled that a statement of profile characteristics will "not, in and of itself, create a reasonable suspicion." United States v. Hanson, 801 F.2d 757,762 (5th Cir. 1986). As the Supreme Court concluded in Reid v. Georgia, the profile characteristics "describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the court to conclude that as little foundation as [the profile characteristics] could justify a seizure." 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980). Profile characteristics are of little value in the forfeiture context without other persuasive evidence establishing the requisite substantial connection. Even if the tenuous suspicions here justify a brief stop, they surely do not rise to the level required for probable cause to forfeit. The Court must demand more in order to avoid the random seizures condemned by the Supreme Court in Reid.

Regarding the dog alert, the District Court diminished the probative value of a dog alert for two reasons: (1) the level of contamination of the nation's currency with trace elements of narcotics as well as (2) the verification of the dog's alert and the dog's reliability. Court's have taken judicial notice that between 71 and 90 percent of the nation's currency has trace elements of narcotics. Id at 475. In the case at bar, the claimants did not proffer a contamination theory because the currency was not examined

to determine whether or not it actually had trace elements of narcotics on it. Additionally, the court was not told of the reliability of Pyro-the alleged narcotics detecting dog- other than his handler said that he was "certified" and has given at least one false positive.  The handler never state *how* Pyro was certified, *what* Pyro was certified to detect, *when* Pyro was certified, Pyro's track record of corroborated alerts. Critically, since the currency itself was not examined to determine whether or not narcotics was present on the currency itself, as to presumably corroborate Pyro's alert, one can only speculate whether Pyro alerted to the scent of narcotics on the cash or the scent of cash itself.  The record in this matter is void of such answers. If the court is inclined to believe the dog alerted to a controlled substance, absent corroboration, still the alert tells very little whether the currency was actually exchanged or intended to be exchanged for drugs by the claimants.  See U.S. $38,600 in U.S. Currency 784 F.2d 694,698-699, (5th Cir. 1986); U.S. v. One lot of U.S. Currency totaling $14,665.00, 33 F.Supp.2nd 47, 58 ( D. Mass.1998).

For those reasons, the District Court concluded "the government must come forward with something more than a drug courier profile and a dog alert to show a "substantial connection" between the seized funds and an exchange of illegal drugs." Id at 478.  Coleman avers the same.

As an example of other probative evidence of a "substantial connection" along with an alert, the District Court cited the following cases:

> In each of these cases there was an "alert" which was corroborated by other probative evidence of a substantial connection.  *See* U.S. v. $14,500.00 in United States Currency, 767 F.Supp.1123, 1125-1126 (M.D.Fla. 1991) (airport detention based on drug courier profile, telephone calls to well-known Orlando criminal, subsequent investigation leading to arrest of claimant for possession of cocaine, search of residence discovered paraphernalia);  United States v. $100,000 761 F.Supp. 672, 673-75 (E.D.Mo.1991) (airport detention based on drug courier profile, traveling under alias, money concealed in underwear, tools of drug trafficking trade in luggage); United States v. South Side Finance, Inc. 755 F.Supp. 791, 793-94 (N.D. Ill. 1991). (information from

informants indicating defendant business operating as cocaine supplier, DEA investigation, surveillance, search warrant); <u>United States v. $46,559.00 in United States Currency</u>, 758 F.Supp.613, 614-615(D.Or.1990) (false identification, stolen 9mm pistol, .357 revolver, paraphernalia, drugs); <u>United States v. $252,671.48 in United States Currency</u>, 734 F.Supp.254, 258 (N.D. Tex.1990) (affidavit of coconspirator, use of alias, search warrant, odor of drugs); <u>United States v. $25,055.00</u> 28 F.Supp.1406, 1407 (E.D.Mo.1990). (airport detention based on drug courier profile, mobile telephone and drugs seized, subject wanted for misdemeanor narcotics charge, subject admitted claimant wanted him to transport currency, DEA investigation subsequent to seizure, informant's information that subject worked with claimant in narcotics trafficking).

The District Court concluded that

Thus, the mere fact that a dog alerts to the currency, without other probative evidence linking the currency to violation of the drug laws, will not support forfeiture." <u>Id</u> at 477.

No such "other substantial connection" as found in the preceding cases is present

in either Coleman's facts, or Merritt's facts.

In <u>U.S. $53,082 in U.S. currency</u>, 773 F.Supp. 26 (E.D. Michigan 1991) aff'd.

<u>U.S. $53,082,</u> 985 F.2d 245 (6th Cir. 1993), the United States District Court held that the

government failed to establish probable cause for the forfeiture of currency.   In coming

to its conclusion, the District Court surmised the government significant factors as

1. The claimants did not have baggage receipts;

2. The claimants had purchased their tickets with cash;

3. The claimants were carrying in excess of $20,000 each in their socks;

4. The claimants did not provide the agents with a satisfactory explanation as to how they came by such a large sum of money or what they intended to use it for.

5. The claimants were going to El Paso, Texas, and staying less than twenty-four (24) hours.

6. The currency was subjected to a dog sniff and the dog alerted to the currency.

The court reasoned that,

The first four factors and, arguably, the fifth are equally consistent with any number of illegal activities not associated with an exchange of the currency for controlled substances. Although the sixth factor links the currency to controlled substances, it does not link the *claimant's* use of the defendant currency to controlled substances. The sixth factor standing alone or in conjunction with the other factors, does not persuade this court that there was "a fair probability that the properties to be forfeited are the proceeds of illegal drug transactions." <u>United States v. Thomas</u>, 913 F.2d 1111, 1114 (4th Cir.1990). Accordingly, notwithstanding the legality of the seizure of the defendant currency, the court holds that the government did not have probable cause to forfeit the currency."

**<u>Substantial amount of cash, Evasive answers, Nervousness, Marijuana residue,
Currency wrapped in rubber bands-not probable cause for forfeiture (Merritt's
41,000.00)</u>**

The government claims that Claimant Merritt's cash is due to be forfeited because
of the drug courier profile factors discussed in Coleman's case, as well as the additional
factors of Merritt's nervousness, and marijuana residue found in his bag.  Merritt
disagrees with the government and contends that the factors do not rise to the level of
preponderance of the evidence, much less probable cause that a substantial connection
exists between his seized funds and an *exchange* for a controlled substance.  Merritt
contends the facts only rise to the level of mere suspicion.  Merritt still makes the
contention even though marijuana residue was found in the bag in his possession.  The
Fifth Circuit Court of Appeals agrees with Merritt.

<u>U.S. v. 38,600 in U.S. currency</u> 784 F.2d 694 (5th Cir. 1986), the Circuit Judges
held that the evidence did not establish probable cause for belief that substantial
connection existed between seized money and its exchange for a controlled substance so
as to warrant forfeiture under the Comprehensive Drug abuse Prevention and Control Act
of 1970, where evidence included $38,600, discovered concealed under back sear in
claimants vehicle, pipe bearing marijuana residue, cigarette rolling papers, and claimants
evasiveness regarding his destination and identity of owner of money, didn't establish
probable cause for belief that substantial connection existed between seized money and
its *exchange* for a controlled substance so as to warrant forfeiture under the
Comprehensive Drug abuse Prevention and Control Act.

The Court found the marijuana residue "relevant" and conceded that "the facts
gave rise to a strong suspicion, perhaps even probable cause of *some* illegal activity, but

did not give rise to a reasonable belief, supported by more than mere suspicion, that the claimant furnished or intended to furnish or had received the money in *exchange* for drugs." Id at 698.

In the case at bar, the marijuana residue found in Merritt's bag, as well as the relative amount of cash is indistinguishable from $38,600.  Thus the court should find such reasoning extremely persuasive.

**Elements of the Drug Courier profile, nervousness, and cash bound with rubber bands, dog alert to cash, plausible use for cash, no criminal record, and no ties to drug dealers, truthful with police-insufficient evidence to find probable cause for forfeiture.**

Both Coleman and Merritt contend that the drug courier profile factors previously cited, combined with other factors including the manner in which the cash was packaged, the fact that they had a plausible use for their cash, neither individual has a criminal record, no ties to drug dealers, and were truthful with police show that their currency is not subject to forfeiture.  The government's factors of nervousness and the bundling of the currency makes much ado about nothing.  The United States District Court in Massachusetts agrees with Merritt and Coleman.

In U.S. v. One lot of U.S. Currency totaling $14,665.00, 33 F.Supp.2nd 47 ( D. Mass.1998) the District Court held that

> Government failed to demonstrate that it had probable cause to institute forfeiture proceeding against nearly $15,000 in currency bundled with rubber bands and carried in suitcase by young man who was member of ethnic minority, who was nervous and upset when the airport security guard asked him to open his briefcase, who initially forgot the combination to his briefcase, who purchased his ticket in cash the day of the flight, for a stay of four days in Las Vegas, who explained that he intended to use the money to put a down payment on a home, and who did not have the telephone number of the friend that he was planning on meeting in Las Vegas, notwithstanding that trained narcotics dog alerted positively for the presence of narcotics on the seized currency; claimant's story about source of the money was reasonable and largely confirmed, claimant did not have criminal record, was not shown to have had personal relationships with drug dealers and was truthful with police.

The District Court specifically found that paying for the ticket in cash, the bundling of the currency in rubber bands of "extremely limited probative value", and nervousness when stopped by officers "not suspicious". Id. at 54-55.

Even if the court finds Coleman's and/or Merritt's story regarding the use of the money implausible, the government's case still would not rise to the level of preponderance of the evidence, much less reasonable suspicion.

In Jones v. DEA, 819 F.Supp. 698 (M.D. Tenn. 1993) the District Court declined to forfeit the claimant's currency given elements of the drug courier profile, dog sniff, rubber bands wrapped around the currency and an unbelievable story from the claimant regarding the source and intended use of the funds.  The relevant evidence at trial was summarized as

> 1.  Mr. Jones purchased a round-trip ticket to Houston (an alleged "source city" for narcotics) with cash, and with reservations giving him a short lay-over in Houston.
> 2. Mr. Jones appeared nervous at the airport.
> 3. Mr. Jones carried a small overnight bag and checked no luggage.
> 4.  Subsequent to the seizure, Mr. Jones offered an explanation for his actions which is unpersuasive and not credible.
> 5. Mr. Alexander, an associate of Mr. Jones, traveled to Houston two weeks before Mr. Jones's planned trip.
> 6. Mr. Gentry, another associate of Mr. Jones, heard a rumor that Mr. Alexander had been involved with narcotics.
> 7. The current husband of the person whom Mr. Jones intended to visit in Houston was, subsequent to the seizure and before his marriage, arrested on narcotics charges.
> 8. The phone number subsequently belonging to the person whom Mr. Jones intended to visit in Houston had shown up on a pen register trace during a narcotics investigation.
> 9.  A dog alerted to the cash.

The District Court concluded that "…the aggregation of these pieces of evidence amount to little more than mere suspicion that Mr. Jones was engaged in drug activity." Id. at 722.

In U.S. v. $30,000 in U.S. Currency, 30 Fed.Appx.473 (6th Cir. 2002) the Court held the government lacked probable cause to forfeit cash where seizure of cash from air traveler was not supported by probable cause that funds were evidence of a crime, even

though traveler was traveling under false name, was carrying large sum of money that he claimed belonged to someone else, was carrying some of funds in his socks, and did not provide very good answers to questions about intended use or purpose for money; traveler explained his use of his brother's name and produced own identification when asked, money was readily produced and not disguised or strapped to traveler's person, and apparent foolishness in carrying large sum of cash and going cold-calling for investment opportunities did not rise to level of probable cause of drug-trafficking.

<u>CONCLUSION</u>

Speculation cannot prove what facts fail to present.  The government's evidence did not show that Coleman and Merritt were suspected of engaging in drug transactions prior to the seizure.  Coleman and Merritt did not attempt to buy drugs, using the seized money, from a government witness.  Coleman and Merritt did not sell drugs or attempt to sell drugs to a government witness, and receive the seized money in exchange.  Coleman and Merritt did not furnish the money to assist any government witness in the facilitation, manufacture, distribution of drugs.  This is clear because no charges were filed against the claimants involving criminal acts and the use of their money.  Thus no, substantial connection, by a preponderance of the evidence, exists between the seized money and drug trafficking, and or an exchange for drugs.

In short, there are no facts that connect the seized currency to the exchange of a controlled substance as to render the currency forfeitable under 21 U.S.C.881(a)(6), by a preponderance of the evidence. Although there may be some suspicion surrounding the claimants, particularly Merritt because of the marijuana residue, mere suspicion is not enough to sustain a forfeiture.

It would be a travesty of justice for the claimants to be permanently deprived of their property, without violating the law which renders the money forfeitable in the first place.  The claimants should not be punitively punished, because of the claimant's inexperience, recklessness, disorganization, unpreparedness, stupidity, prejudice, or failure to conform to typical educated middle class or upper middle class standards of travel, dress, demeanor, and home buying.

WHY THE GOVERNMENT HAS NOT PROVEN BY A PREPONDERANCE OF THE EVIDENCE THAT THE SEIZED FUNDS FROM COLEMAN ARE SUBJECT TO FORFIETURE.

1. PAYMENT FOR TICKET IN CASH NOT ILLEGAL OR UNUSUAL OR INHERENTLY SUSPICIOUS
2. TRAVELED UNDER TRUE NAME
3. TRAVELING TO AN ALLEGED SOURCE CITY-NOT ILLEGAL
4. QUICK TURNAROUND FOR FLIGHT-NOT ILLEGAL OR UNUSUAL
5. CLOTHES COMMENSURATE WITH LEGNTH OF STAY
6. AMOUNT OF MONEY NOT ILLEGAL TO CARRY-PERHAPS UNUSUAL
7. SECURING CASH WITH RUBBERBANDS NOT ILLEAGAL OR INHERENTLY CRIMINAL OR SUSPICIOUS-See
8. MONEY NOT WRAPPED IN CELOPHANE OR BAGS OR FABRIC SOFTENER, BUT IN PLAIN VIEW UNDERNEATH CLOTHES.
9. NO NERVOUSNESS
10. PLAUSIBLE STORY ABOUT PURPOSE OF TRIP
11. DID NOT GIVE CONFLICTING STORY ABOUT TRIP
12. COLD CALLING FOR INVESTMENT OPPORTUNITIES-UNORGANIZED BUT NOT ILLEGAL
13. NO KNOWN DRUG ASSSOICATES IN "SOURCE CITY"
14. GOV'T DID NOT HAVE KNOWLEDGE OF ANY PERSON PURPORTING TO SELL DRUGS TO COLEMAN
15. NO DRUG ARRESTS OR CONVICTIONS
16. NO EVIDENCE OF AN EXCHANGE –See transcript
17. NO MARIJUANA RESIDUE OR PARAPHANALIA-See transcript
18. NO ADMISSION OF INTENT TO BUY OR SELL CONTRABAND-See transcript
19. NO ATTEMPT TO FURNISH CASH FOR DRUGS
20. NO UNDERLYING CONTROLLED SUBSTANCE CRIME CONNECTED TO CASH

WHY THE GOVERNMENT HAS NOT PROVEN BY A PREPONDERANCE OF THE
EVIDENCE THAT THE SEIZED FUNDS FROM MERITT ARE SUBJECT TO
FORFIETURE.

1. PAYMENT FOR TICKET IN CASH NOT ILLEGAL OR UNUSUAL OR
   INHERENTLY SUSPICIOUS
2. TRAVELED UNDER TRUE NAME
3. TRAVELING TO AN ALLEGED SOURCE CITY-NOT ILLEGAL
4. QUICK TURNAROUND FOR FLIGHT-NOT ILLEGAL OR UNUSUAL
5. CLOTHER COMMENSURATE WITH LEGNTH OF STAY
6. AMOUNT OF MONEY NOT ILLEGAL TO CARRY-PERHAPS UNUSUAAL
7. SECURING CASH WITH RUBBERBANDS NOT ILLEAGAL OR
   INHERENTLY CRIMINAL OR SUSPICIOUS
8. MONEY NOT WRAPPED IN CELOPHANE OR BAGS OR FABRIC
   SOFTENER, BUT IN PLAIN VIEW UNDERNEATH CLOTHES.
9. NERVOUSNESS-NOT UNUSUAL FOR AIR TRAVELERS
10. PLAUSIBLE STORY ABOUT PURPOSE OF TRIP
11. NO KNOWN DRUG ASSSOICATES IN "SOURCE CITY"
12. NO DRUG ARRESTS OR CONVICTIONS
13. NO EVIDENCE OF AN EXCHANGE
14. NO ADMISSION OF INTENT TO BUY OR SELL CONTRABAND
15. NO UNDERLYING CONTROLLED SUBSTANCE CRIME CONNECTED TO
    CASH
16. CASH WAS NOT MARKED "BUY  MONEY"
17. NO ATTEMPT TO FURNISH CASH FOR DRUGS
18. DID NOT LIE TO POLICE OFFICERS
19. DRUG RESIDUE DOES NOT SHOW EXCHANGE OF MONEY FOR DRUGS
20. EVIDENCE REGARDING SOURCE OF MONEY CREIDBLE AND
    LARGELY CORROBORATED

Wherefore, premises considered, the claimants pray that this court grant the claimant's

motion to dismiss or in the alternative motion for judgment as a matter of law.

Respectfully submitted,

/s/ Joe M. Reed
Joe M. Reed
Attorney for Claimants

**<u>Certificate of Service</u>**

I hereby certify that the foregoing was served on the Honorable John T. Harmon,

Assistant United States Attorney, P.O. Box 197, Montgomery, AL  36101 by electronic

notification this 20th day of February, 2007.


                                                                   ____/s/ Joe M. Reed____
                                                                    Joe M. Reed