IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | CASE NO. 2:05-cv-1086-WKW |
| ) | |
| EIGHTY THOUSAND SIX HUNDRED ) | |
| THIRTY-THREE DOLLARS ($80,633.00); ) | |
| FOUR THOUSAND EIGHT HUNDRED ) | |
| SEVENTY-EIGHT DOLLARS ($4,878.00); ) | |
| THIRTY-SIX THOUSAND FIVE ) | |
| HUNDRED DOLLARS ($36,500.00), ) | |
| ) | |
|     Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

This is a civil forfeiture *in rem* action seeking forfeiture of United States currency in the amounts of $80,633.00, $4,878.00, and $36,500.00 seized at the Montgomery Regional Airport on July 6, 2005. The action was tried on February 12, 2007. Upon submission of post-trial briefs by the parties, the court entered judgment (Doc. # 61) in favor of the government on March 31, 2008, for the reasons stated in this memorandum opinion.

### I. BACKGROUND AND PROCEDURAL HISTORY

July 6, 2005, turned out to be a bad day for Claimants Jacquard Merritt ("Merritt") and Michael Coleman ("Coleman"). On that day, they attempted to fly from Montgomery, Alabama, to San Antonio, Texas, carrying large sums of currency secreted on their persons and in their carry-on bags. After being separated during routine screening procedures, both

men came under suspicion by airport authorities when unusual amounts of currency were discovered in the possession of each. Merritt acted nervously, and Coleman tried twice to run from the airport. Coleman eventually offered a bribe to an airport policeman, a small amount of marijuana was found, contradictory and suspicious explanations were offered, and both Coleman and Merritt left the airport, not by jet plane, and considerably poorer for the experience.

The government alleges that the defendant currency is subject to forfeiture because it "constitutes monies furnished, or intended to be furnished, in exchange for controlled substances, or represents proceeds of trafficking in controlled substances or was used or intended to be used to facilitate violations of" 21 U.S.C. § 801 *et seq*. (Compl. ¶ 7.) On January 11, 2006, Coleman and Merritt filed claims of ownership to the defendant currency asserting that the currency was unlawfully seized by the government. (Answer ¶ 5.) In affidavits attesting to their ownership of the defendant currency, (Answer, Exs. A & B), Coleman averred he owns the $80,633.00, and Merritt averred he owns the $36,500.00 and the $4,878.00.[1]

After denial (Doc. # 55) of the claimants' motion to suppress, the matter proceeded to a bench trial. At the beginning of the bench trial, the parties stipulated to the admission of the suppression hearing transcript, the toxicology report identifying the marijuana retrieved from Merritt's bag, (Gov. Ex. 1; Trial Tr. 4), the marijuana itself, (Trial Tr. 46), and

---

[1] Although no testimony supports the amounts Coleman and Merritt claim, the parties have stipulated that they are correct. (Trial Tr. 4).

to the amounts appearing in the heading of the case as being the correct sums of cash seized and at issue. (Trial Tr. 4-5.) Before resting its case, the government called Corporal Travis Green ("Corporal Green") to identify photographs and other evidence. The claimants made an oral motion to dismiss the government's case as not having met the preponderance of the evidence standard. Merritt also moved to suppress his statements "because Mr. Merritt was in the custody of police officers and there is no evidence on the record that he was ever read his rights." (Trial Tr. 34.) The court reserved ruling on the oral motion to dismiss and denied the renewed motion to suppress. (Trial Tr. 51.) The claimants then adduced evidence in support of their claim.

## II. JURISDICTION AND VENUE

Jurisdiction is proper pursuant to 28 U.S.C. §§ 1345 and 1355. Venue is proper pursuant to 28 U.S.C. § 1395 and 21 U.S.C. § 881(j).

## III. LEGAL STANDARD

The government brings this action pursuant to 21 U.S.C. § 881(a)(6). (Compl. ¶ 2; Post-Trial Br. 2.) This section states that "all moneys . . . furnished or intended to be furnished . . . in exchange for a controlled substance . . . , all proceeds traceable to such an exchange, and all moneys . . . used or intended to be used to facilitate a violation of [the drug laws]" are "subject to forfeiture to the United States." 21 U.S.C. § 881(a)(6).

To carry its burden, the government must "establish, by a preponderance of the

evidence, that the property is subject to forfeiture."[2] 18 U.S.C. § 983(c)(1). Where, as here, "the property was used to commit or facilitate . . . or was involved in the commission of a criminal offense," it must be proved that "a substantial connection between the property and the offense" exists. 18 U.S.C. § 983(c)(3).[3] In proving a substantial connection, "[t]he government may use evidence gathered [before and] after the filing of the complaint," 18 U.S.C. § 1983(c)(2), and may introduce circumstantial evidence. *See United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1440 (11th Cir. 1991); *United States v. $22,991.00, More or Less, in U.S. Currency*, 227 F. Supp. 2d. 1220, 1231 (S.D. Ala. 2002). However, the government is not required to "connect the defendant currency to any particular drug transaction," or proffer evidence that "point[s] to drugs to the exclusion of all other theories." *United States v. $121,100 in U.S. Currency*, 999 F.2d 1503, 1508 (11th Cir. 1993) (internal quotation marks and citations omitted).

In evaluating the evidence, the court must apply a common sense view of the realities of normal life to the totality of the circumstances. *See United States v. Carrell*, 252 F.3d 1193, 1201 (11th Cir. 2001); *see also United States v. $433,980.00 in U.S. Currency*, 473

---

[2] "The burden of showing something by a preponderance of the evidence, the most common standard in the civil law, simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before he may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 622 (1993) (internal quotation marks and alterations omitted); *see also United States v $52,000.00, More or Less, in U.S. Currency*, 508 F. Supp. 2d 1036, 1039 (S.D. Ala. 2007).

[3] The government contends that § 983(c)(3) does not apply to cases in which the government claims it is entitled to the forfeiture of drug proceeds under 21 U.S.C. § 881. The court finds no support in the Eleventh Circuit for the government's position.

F. Supp. 2d 685, 690 (E.D.N.C. 2007) ("[I]t is not enough to point out possible problems with the separate factors underlying the Government's case, as all the evidence – both direct and circumstantial – can and should be evaluated by the Court as a whole."). Courts have been cautioned in civil forfeiture proceedings "not to dissect strands of evidence as discrete and disconnected occurrences." *$22,991.00*, 227 F. Supp. 2d at 1235-36 (internal quotation marks and citation omitted). If the government carries its burden, the property will be forfeited unless the claimant proves by a preponderance of the evidence that he is an innocent owner in accordance with 18 U.S.C. § 983(d). *See United States v. Cleckler*, 270 F.3d 1331, 1334 (11th Cir. 2001).[4]

## IV. ANALYSIS

From a careful review of the evidence presented, the court makes findings of fact and conclusions of law as to Coleman and Merritt.

**A.    Factual Findings**

On July 6, 2005, Coleman and Merritt presented themselves as air passengers at the Montgomery Regional Airport in Montgomery, Alabama, with tickets purchased for cash by Merritt the morning of their intended flight to San Antonio, Texas. Their return flight was scheduled for early the next morning. Coleman and Merritt did not check any bags, but they each had one carry-on bag in their possession. San Antonio is known in the law enforcement community as a drug trafficking destination.

---

[4] Neither claimant has asserted the innocent owner defense; thus, it is not applicable to the instant forfeiture.

Coleman had United States currency in the amount of $80,633.00 secreted on his person and in his carry-on bag. The currency, in denominations of less than $100, was variously wrapped in bank bands and rubber bands. Upon the discovery by a TSA agent of some of the secreted money in his bag, Coleman twice attempted to flee the airport and its authorities. Coleman had to be caught and restrained by a police officer after he fled from a secure area of the airport through the security checkpoint and into the main lobby.

Coleman acted fidgety and would not stop moving when Officer Robbie Fitts ("Officer Fitts") tried to pat him down for weapons. For his own safety, Officer Fitts had to handcuff Coleman in order to complete the patdown. While completing the patdown, Officer Fitts discovered more large sums of currency on Coleman's person. Officer Fitts stacked the currency on a desk or table near Coleman. Coleman attempted to bribe him by stating, "Don't let these white boys take all this money from you. Get some of the money. I know law enforcement don't pay you that much," (Hr'g Tr. 112), and by telling him that he "needed to get some of this money." (*Id*. at 122.) As he was making these statements, Coleman reached for the money behind his back and attempted to stuff it behind training materials on the bookshelf in the office.

When asked for the purpose of the trip to San Antonio, Coleman told Officer Fitts, according to Corporal Green, that Coleman and Merritt were going to San Antonio to buy shoes and clothing items to go into business. (Hr'g Tr. 68.) Coleman did not offer any other explanation for the trip to San Antonio or for the source of the currency.

At the time of Coleman's attempted flight, Merritt was discovered to have secreted $41,378.00 on his person and in his carry-on bag. Like the currency found in Coleman's possession, Merritt's currency was in small denominations of less than $100 and was wrapped in bank bands and rubber bands. Upon discovery by a TSA agent of some of the secreted money in his shaving kit, Merritt acted nervously, made a cell phone call, and was overheard to say, "They found it." (Hr'g Tr. 12.)

While Coleman's stated purpose for the claimants' trip to San Antonio was to purchase shoes and clothing to open a business, Merritt testified that they were shopping for real property. Although he had never owned a piece of real estate in his life, (Trial Tr. 140), he testified that he was going to "buy some real estate property to start my investment – my own investment company." (Trial Tr. 55.) He explained that Coleman came along "to see what he could see, " (*id*. at 80), and that "if we looked into the property, we like it, take it from there. . . . But if we wouldn't have seen anything, we was coming right back." (Trial Tr. 116.) Despite being a business trip, Merritt was traveling in shorts and a tee shirt, and he had no business attire with him.

Because the authorities were suspicious of Coleman's and Merritt's actions and explanations, agents from the Drug Enforcement Administration ("DEA") were called to the airport. After the DEA arrived, a qualified drug dog, Pyro, alerted to both Merritt's carry-on bag on the floor and Coleman and Merritt's cash that had been stacked on the table. Marijuana was subsequently found in the bag.

Merritt has a very sketchy financial history. He moved to Montgomery in 2004 and lived with his grandmother. He testified that his last employment was as a hotel clerk in San Antonio in 2004, at which he earned seven or eight dollars per hour. (Trial Tr. 86.) He had been discharged from the military and was supporting six of his seven children at the court-ordered rate of $1200 per month. (*Id*. at 87.) His ex-wife lived in San Antonio and had also been in the military. Merritt admitted to being "over 30 or $40,000 in debt," (*id*. at 123), due to child support arrearage, a repossessed car, credit card bills, student loans, and medical bills.

When asked about the source of his money, Merritt offered several sources: "from the government from going to school. I was getting almost a thousand dollars a month going to school, my disability, plus my unemployment. And, plus, my wife was – I didn't have to pay any bills either." (*Id*. at 88.) Merritt further asserted that his grandmother and uncle loaned him "probably around about 15, ten to 15 [thousand dollars]," (*id*. at 87), but there is no documentation of the loan, and it was not otherwise substantiated.

Additionally, Merritt claimed that the actual money seized at the airport was a cash payment he received from Domanique Robinson ("Robinson") of A&A Realty, "right there in the bank," on July 5, 2005 – the day before the seizure. (Trial Tr. 101.) Merritt's testimony at trial was contradictory and does not bear repeating in full. In essence, Merritt claims to have loaned $20,000 to Robinson in May 2005 in return for interest payments of $5,000 per month. According to Merritt, Robinson repaid Merritt "around 30 some thousand

dollars" or "between 30 and 35,000," (*id*. at 64); however, Merritt later stated that he allowed Robinson to keep the $20,000 for another deal while Merritt collected interest "between five and 10,000 [dollars], whatever. I can't remember." (*Id*. at 96.) Merritt introduced Robinson's business card and a promissory note that purports to represent one or more transactions between Merritt and Robinson. Merritt did not introduce other exhibits or present other witnesses to corroborate the source of the money.

**B.    Conclusions of Law**

    **1.    Coleman**

Applying a common sense view of the realities of normal life to the totality of the circumstances, the court has no difficulty concluding that the preponderance of the evidence establishes a substantial connection between Coleman's currency and drug trafficking activity. Although the court had previously determined that probable cause existed to seize the funds (Doc. # 55), Coleman chose not to testify, and, other than his affidavit in which he claimed ownership of the $80,633.00, he offered no evidence with respect to his claim. He must bear the consequences of no record in his behalf, including negative inferences to be drawn from the lack of evidence. *See United States v. $64,640.00 in U.S. Currency*, No. 06-568, 2007 WL 1575241 at *6 (D. Neb. May 30, 3007) ("The court can only draw inferences based on the record that was presented and, in this case, [the claimant] must also 'bear the consequence of lack of evidence.'").

9

Coleman was found to be secretly carrying $80,633.00, in small denominations and wrapped in rubber bands. "Although the quantity of the cash alone is not enough to connect it to illegal drug transactions, it is significant" evidence of illegal activity. *$242,484.00*, 389 F.3d at 1161. This is because people in legitimate businesses, as opposed to drug rings, do not travel with this amount of cash. *See id.* Moreover, the small denominations and the packaging of the currency support the conclusion that the currency is related to drug transactions. *See United States v. $252,300.00 in U.S. Currency*, 484 F.3d 1271 (10th Cir. 2007) (finding that a large amount of currency of various denominations, bundled in stacks held by rubber bands and wrapped in cellophane, is strong evidence of a drug transaction).

Coleman's uncorroborated statement to officers that he and Merritt were shopping for clothes and shoes to open a store is simply not sufficient to overcome the natural suspicion caused by traveling with such a large amount of currency. Not only was Coleman's explanation uncorroborated, but it was also contradicted by Merritt, who stated they were shopping for real estate. This is probative of illegal activity. *Id*. at 1274. Coleman's flight from authorities, his abandonment of over $80,000.00, and his bribery attempt are all factors that suggest illegal activity. Furthermore, although it has low probative value in this instance,[5] it is relevant that a drug dog alerted on the currency, *$242,484.00*, 389 F.3d at

---

[5] The currency seized from both of the claimants was all stacked together on a table when the drug dog alerted on the currency. There was no effort to segregate Coleman's money from Merritt's, and no witness was able to do so at trial. Nevertheless, the claimants do not dispute that the dog alerted to the currency, as evidenced by Coleman in his brief: "The drug sniffing dog alerted to the cash of both Coleman and Merritt . . . ," (Doc. # 58, at 5), and "The government merely shows . . . a dog alert, as it relates to Coleman's $80,633 . . . ." (*Id.* at 8.) Instead, the claimants only challenged the reliability of Pyro's alert and did not move to strike or exclude such evidence. The court found the evidence

1166, and is entitled to probative weight. *United States v. Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars*, 403 F.3d 448, 460 (7th Cir. 2005).

Finally, by fleeing, Coleman voluntarily, publically, and unequivocally orphaned the $80,633.00 he of late claims to own. "A large sum of legitimate cash always has one or more proud parents but drug money, once it is seized by law enforcement, is often treated like an orphan child." *$242,484.00*, 389 F.3d at 1167. Coleman's tardy affection for that which he so publicly disdained is insincere and is a circumstance that is given much probative weight.

In sum, the court finds the government has carried its burden with respect to the $80,633.00 claimed by Coleman. There being a substantial connection between the currency and drug trafficking, the currency is subject to forfeiture.

2. **Merritt**

Unlike Coleman, Merritt actively challenged the government's case. However, in considering the totality of the circumstances, the court found most of Merritt's testimony incredible, and his attempt to rebut the government's case has failed.

In addition to the large amount of currency Merritt was carrying, as well as its denominations and packaging, Merritt's statements explaining the purpose of the trip, which were both internally inconsistent and inconsistent with his travel companion's statements, are probative of a substantial connection between the currency and drug trafficking. *See id.* at 1164; *$252,300.00 in U.S. Currency*, 484 F.3d at 1274; *Funds in Amount of Thirty*

---

admissible but accordingly gives less weight to the evidence with respect to Coleman's claim.

*Thousand Six Hundred Seventy Dollars*, 403 F.3d at 467. Merritt's stated purpose for the trip is implausible, and he failed to present any witness who could corroborate his story.

The most persuasive factor weighing against Merritt is the overwhelming lack of evidence suggesting a source of legitimate income. A lack of legitimate income sufficient to explain large amounts of cash "unrebutted by any evidence pointing to any other source of legitimate income or any evidence indicating innocent ownership, satisfies the burden imposed by the statute [to establish a substantial connection]." *United States v. $174,206.00*, 320 F.3d 658, 662 (6th Cir. 2003). Moreover, evidence of "limited incomes and significant debts . . . is entitled to considerable weight." *$252,300.00*, 484 F.3d at 1275. Lack of receipts, tax returns, or other documentary proof regarding origins of the cash heightens inferences of illegal activity. *Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars*, 403 F.3d at 468-69.

Merritt's explanations of the source of the funds were contradictory, lacking in any meaningful detail or documentation, and, frankly, implausible. He reported a very sketchy financial history. He admitted not filing tax returns during the relevant period, could provide no legitimate source of the funds, admitted being deeply in debt, and provided no evidence of income to justify his possession of such a large sum of cash. The family members from whom Merritt claimed to have borrowed the money failed to materialize as witnesses. Moreover, Merritt provided no receipts or testimony of bank officers as to the supposed cash transaction with Robinson, nor did Robinson testify. The promissory note admitted in

12

evidence did not itself explain the *source* of the funds Merritt claims he loaned to Robinson, and Merritt presented conflicting explanations of the transaction underlying the document. Merritt was confused or evasive about the exact amounts involved in the transaction as well. These facts all point to illegal activity.

And, in light of the evidence that marijuana was found in Merritt's carry-on bag, the court is convinced that the illegal activity involved drug trafficking. Although, for the same reasons as discussed above, the court must give low probative value to the drug dog's alert on the currency stacked on the table, the drug dog's earlier alert on Merritt's bag, which was located on the floor, is relevant. While the alert itself is probative of the connection between the money and drug trafficking, *see $30,670.00*, 403 F.3d at 460, it also gave sufficient probable cause for further search of the bag, leading to discovery of the marijuana. It is undeniable that the presence of a large sum of currency in the same bag as illicit drugs is strongly probative of a substantial connection between the two. *See United States v. $110,873.00 in U.S. Currency*, 159 Fed. Appx. 649, 652 (6th Cir. 2005); *United States v. $118,170.00 in U.S. Currency*, 69 Fed. Appx. 714, 717 (6th Cir. 2003); *United States v. U.S. Currency Totaling $101,207.00*, No. 101-162, 2007 WL 4106262, at *6 (S.D. Ga. Nov. 16, 2007).

Accordingly, the court finds a substantial connection between the currency that Merrit claims and the illegal drug trade. Merritt failed to rebut the government's case, and the government has established by a preponderance of the evidence that the $4,878.00 and

13

$36,500.00 claimed by Merritt are proceeds traceable to an exchange for a controlled substance and, thus, are subject to forfeit.

## V. CONCLUSION

For the reasons stated above, judgment was entered in favor of the United States of America and the defendant currency was forfeited to the United States. It is further ORDERED that Claimants' oral motion to dismiss is DENIED.

DONE this 21st day of April, 2008.

                                            /s/  W. Keith Watkins
                                            UNITED STATES DISTRICT JUDGE